THE CIMBRIA.

(District Court, D. Massachusetts. April 25, 1907.)

No. 1,798.

1. MARITIME LIENS—STATUTORY LIEN—EFFECT OF DELAY IN ENFORCING.

A statutory maritime lien for supplies, good by the terms of the statute for two years, *held* not lost before expiration of the two years by delay in enforcing it, though postponed under the circumstances in favor of later

liens, and no interest allowed upon it prior to the filing of a petition to enforce it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 122.]

**2.** SAME—SUPPLIES—LIEN UNDER GENERAL MARITIME LAW.

No lien is given by the maritime law for supplies and repairs not furnished directly to the vessel by the materialman, but delivered by him at a distant port to a carrier, though such delivery was by order of the owner, and the goods were consigned to the vessel or to her owner.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 7.]

**3.** SAME—STATUTORY LIEN.

Equipment and repairs for a vessel lying in her home port in Maine were ordered by her owner from places in other states to be there delivered to carriers for shipment to such port. It was the common understanding of the parties that they were for such vessel, and they were received and used on her in accordance with such understanding. *Held,* that under the statute of Maine, which gives a lien for such equipment furnished to a domestic vessel, without any requirement that it shall be furnished within the state, those furnishing the same were entitled to a lien for the purchase price enforceable in a court of admiralty.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, §§ 42, 43.

Created by state laws, see note to The Electron, 21 C. C. A. 21.]

**4.** SAME—GENERAL MARITIME LAW.

A steamboat company leased the right to use a wharf, with privilege of using the ticket office and waiting room for a certain term at an agreed rental, and also agreed to pay for electric lights and water, and to protect the lessor by insurance. No particular vessel was mentioned, and the lessee operated a steamer of its own and another, both of which used the wharf and other facilities. *Held,* that the lessor was not entitled to a lien upon the lessee's vessel for the unpaid rental, or any part thereof, as wharfage; such rental being payable without regard to the use made of the leased property, or whether it was used at all.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 44.]

**5.** SAME.

A maritime lien cannot be claimed on a vessel owned by a steamboat company running a line of boats during the summer season between Boston and Nahant for money which the company contracted to pay for the services of a band at the latter place, nor for repairs to the wharf there.

**6.** SAME—SUPPLIES ORDERED BY OWNER.

A vessel owned by a Maine corporation, and whose home port was in Maine, was taken by the owner to Boston, where she was operated during the summer season as a passenger boat between that port and Nahant. The president and manager of the company went to Boston and maintained an office there during all of such time, and all supplies for the vessel were furnished on his order, and not that of the master. *Held,* that there was no maritime lien on the vessel for such supplies, in the absence of a proof of a common understanding for such lien.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 46.]

**7.** SEAMEN—LIEN FOR WAGES.

The master of a steamer, who, on being paid off, was requested by the owner to take her to a wharf, where she was to be laid up and to remain in charge until something was done, which he did, remaining on board after the crew was discharged and until her seizure, two days

later, was entitled to a lien for his wages for such two days at the rate previously paid him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Seamen, § 158.]

In Admiralty. On the intervening petitions of S. P. Blackburn & Co., Staples Coal Company, D. Kahnweiler's Sons, Almy Water Tube Boiler Company, Bass Point Company, Penobscot Machinery Company, Snow & Nealley Company, Maine Coast Transportation Company, P. Ahern, C. H. Buck & Co., Thomas F. Gallagher, Hunter & Brander, W. M. Crosby, and E. & I. K. Stetson.

Duff & Livermore, for libelant.

Benjamin Thompson, Russell & Russell, Carver & Blodgett, Howard D. Nash, Hamilton Tirrell, William T. Atwood, Henry C. Stetson, Frank Keezer, Ernest J. Sanderson, and Montague & Keyes, for intervening petitioners.

Bingham, Smith & Hill, for mortgagee.

DODGE, District Judge. The original libel against the Cimbria was filed by the Lockwood Manufacturing Company on September 11, 1906. No one appeared to claim the vessel, and on September 24, 1906, a decree was entered, upon default, in the libelant's favor, for $371.42, with costs. A warrant for the sale of the steamer issued on the same day, the sale took place October 5, 1906, and the net proceeds thereof, amounting to $3,403.40, were paid into court October 15, 1906. The intervening petitions, above referred to, claiming liens against the proceeds, have been filed at various dates subsequent to the libel. They are named above in the order in which they were filed. All but three of them, as will appear below, are contested by the Veazie National Bank of Bangor, Me., the holder of a mortgage upon the steamer, by virtue of which it claims whatever balance of proceeds may remain after satisfying all liens superior to its own as mortgagee. Upon each petition there has now been a hearing, at which not only the mortgagee, but any other petitioner who desired, has been heard in opposition. The following findings are made upon the evidence introduced at these hearings. The facts material upon the various questions raised, will be stated as nearly as may be in the order of their occurrence.

1. The Cimbria was owned by the Bangor & Bar Harbor Steamboat Company, a corporation existing under the laws of Maine and located at Bangor in that state. She was registered at Bangor and hailed from that port. Prior to June 6, 1906, she ran as a passenger steamer between Bangor and Bar Harbor, or other places in Penobscot Bay and the adjacent waters, remaining at Bangor when not engaged in active employment.

2. In the spring or early summer of 1906, the company which owned her made arrangements to employ her in running as a passenger steamer between Boston and Nahant in this district. She left Bangor to enter upon this employment June 6, 1906, under the command of W. M. Crosby as master; his name being duly indorsed as master on her papers. Henry W. Barbour, president, treasurer, and general manager of the company, came to Boston at the same time, and thereafter remained in or near Boston, taking personal charge of her busi-

ness affairs, as will more fully appear below. He had been master of the steamer while she ran on the Bar Harbor route.

3. On June 6, 1906, when the Cimbria left Bangor for Boston, as above, money was due to certain of the petitioners for articles which they had furnished to her or on her account before that date. These petitioners were Thomas F. Gallagher, Penobscot Machinery Company, Snow & Nealley Company, E. & I. K. Stetson, all of Bangor, David Kahnweiler's Sons, of New York, and Almy Water Tube Boiler Company, of Providence, R. I. The claims of these petitioners will be first dealt with.

4. There was due Thomas F. Gallagher, for supplies furnished to the Cimbria at Bangor:

In October, November, and December, 1904.........................$ 358 56
Between May, 1905, and December, 1905........................... 1,337 60
In April, May, and June, 1906................................... 208 76

In all.................................................$1,904 92

Interest was also due on the bills for these supplies, amounting, when the petition was filed, to $102.02.

I find that these supplies were of such character and were furnished under such circumstances as to give the petitioner a lien for the above amounts due, under Rev. St. Me. 1903, c. 93, § 7. The petitioner had had abundant opportunity to enforce his claim before the steamer came to Boston in June, 1906, of which he had not availed himself. But so far as any express provisions of the Maine statute are concerned, the lien given by it continues for two years; and in view of this fact I find nothing in the evidence which requires the conclusion that the petitioners' lien has been lost by the delay in asserting it, even for the supplies furnished during the seasons of 1904 and 1905. The lien for what was furnished during those seasons, however, though valid, may be postponed, if it becomes necessary, in favor of competing liens of more recent date. But no interest should, under these circumstances, be allowed prior to the filing of the petition.

5. There was due Penobscot Machinery Company, of Bangor, $100 for two sets of three-inch davits ordered May 11, 1906, and furnished to the Cimbria May 31, 1906; the amount mentioned being the agreed price therefor. This petitioner had a valid lien for said amount under the Maine statute above cited.

There was due Snow & Nealley Company, of Bangor, $72.34 for the supplies described in its petition, furnished by it to the Cimbria May 12 and 15 and June 1, 1906. This petitioner had a valid lien under the same statute for that amount.

There was due E. & I. K. Stetson, of Bangor, $100.92 for repairs made upon and materials furnished to the Cimbria in May, 1906. These petitioners had a valid lien under the same statute for that amount. The three last-mentioned claims were not contested.

6. There was due the firm of D. Kahnweiler's Sons, of New York, N. Y., $100, being the agreed price of a 20-foot metallic lifeboat ordered from them May 14, 1906, by the owner of the Cimbria. It was ordered by telegram and letter from Bangor to be shipped "f. o. b. New York," and it was so shipped by said firm, which did business at

New York. It was shipped to and received by the Cimbria's owner, at Bangor, and was placed on board her at that port. It was thereafter used on board her as a part of her equipment.

In ordering the lifeboat, the Cimbria had not been specifically mentioned or referred to, but at that time her owner owned no other vessel, and this the petitioners knew. It was an article of such character as to be necessarily used as equipment on board some steamer or vessel. It was intended for the Cimbria's use when ordered by Henry W. Barbour, above referred to, who was the person who acted on the company's behalf in ordering it. When he thus ordered the lifeboat, Barbour was master of the Cimbria, besides being the president, treasurer, and general manager of the company to which she belonged, and he was engaged in equipping her to come to Boston and begin her intended employment upon the Boston-Nahant route. The petitioners, so far as their own intent is concerned, gave credit to the Cimbria for the price of the lifeboat, and did not rely on the sole personal credit of her owner.

There was also due the Almy Water Tube Boiler Company, a corporation established at Providence under the laws of Rhode Island, $208.16, for repair parts and fire brick furnished by it for the Cimbria's boiler in May, 1906. These repair parts were ordered by letter from Bangor dated May 10, 1906. The letter asked to have them sent to Bangor by Eastern Steamship Company from Boston. The petitioner shipped them, accordingly, from Providence, May 14, 1906, by rail to Boston, addressed to the owner of the Cimbria at Bangor. The petitioner is the only maker of repair parts for such boilers as the Cimbria's, which was an Almy patent boiler. Such parts can be had from the petitioner only. They were necessary, they were ordered by Barbour on the owner's behalf, his authority to represent the owner is undisputed, the order sent stated that they were for the Cimbria, they were in fact intended for her by both parties, and after reaching Bangor they were accepted and used on board her. They were furnished, so far as the petitioner's intent is concerned, like the lifeboat on the credit of the vessel.

Neither of these petitioners can be held to have acquired any lien under the general maritime law. There are two reasons, either of which would be sufficient. The petitioners did not furnish these supplies to the vessel in the sense of the maritime law. The property in the goods passed to the owner of the vessel in New York and in Providence. Delivering goods to a carrier in New York or in Providence for transportation to a vessel in Bangor is not furnishing the goods to the vessel. "There can be no delivery to the ship in the maritime sense, whether of supplies or cargo, so as to bind the ship in rem, until the goods are either actually put on board the ship, or else are brought within the immediate presence or control of the officers of the ship." The Vigilancia (D. C.) 58 Fed. 698, 700. And, in the next place, though the petitioners parted with their goods at their places of residence, New York and Providence, in which ports the vessel, if present, would have been foreign, she was in fact in Bangor, her home port, at the time. No lien can be acquired for supplies upon a vessel in her home port, unless one is given by the local law. If the petition-

ers had taken the lifeboat or the boiler parts to Bangor themselves, and there delivered them on board the Cimbria, or had furnished them through a local agent at Bangor, they would have acquired no lien under the general maritime law. The Eliza Jane, 1 Sprague, 152, Fed. Cas. No. 4,363; The Sarah J. Weed, 2 Low. 555, 561, Fed. Cas. No. 12,350; The Mary McCabe (D. C.) 22 Fed. 750. The place where the vessel is when the supplies reach her is the test. The Vigilancia (D. C.) 58 Fed. 698, 700. If that is her home port, the only lien which can arise is that given by the state law.

The petitioners therefore can have no claim upon the proceeds unless liens are established in their favor under the Maine statute which has been cited. All the express requirements of that statute are satisfied in the case of each petitioner. A debt due to each was contracted by the owner of the vessel, it was contracted for materials or supplies necessary for her employment, and it remains due. Nothing more is required, so far as the express terms of the statute are concerned. Upon these facts, without more, the statute subjects the vessel to a lien to secure payment of the debt. There is no express requirement, as there is in the lien law of Massachusetts (Rev. Laws Mass. c. 198, § 14), that the materials or supplies shall have been furnished within the state.

It is argued, however, that, unless the materials or supplies were furnished in Maine, there can be no lien by virtue of the statute, because a state statute cannot give a lien for materials or supplies furnished elsewhere than within the state. Upon a domestic vessel while outside the state to which she belongs, as upon a foreign vessel while within that state, no lien can be acquired by virtue of the local law. Such cases are governed by the general maritime law, the administration of which is beyond the control of state legislation. The Roanoke, 189 U. S. 185, 23 Sup. Ct. 491, 47 L. Ed. 770; The New Brunswick, 129 Fed. 893, 896, 64 C. C. A. 325; The Golden Rod, 151 Fed. 6, 80 C. C. A. 246. But, upon a domestic vessel within the state to which she belongs, the state has unrestricted power to create liens, under such limitations as it may determine, and liens so created may be enforced in admiralty, if only the conditions of the statute which assumes to give them are complied with, and whether or not those conditions conform in all details to the general rules of the maritime law. The Iris, 100 Fed. 104, 40 C. C. A. 301. Although, therefore, these petitioners did not "furnish" these materials and supplies to the vessel, in the sense of the maritime law, within the state of Maine, but made delivery of them to a carrier outside its limits, yet, in view of the facts that the owner received them in Maine, where the vessel was, upon the understanding that they were for her, that they were immediately made part of her equipment according to that understanding, that they have ever since remained in use on board her, and that the agreed price remains due, I see no reason why the terms of the statute may not have their full effect, and the vessel be held subject to a lien to secure the debt. It may well be that no lien would arise upon a mere delivery of these goods in New York to the owner, or to the carrier for him, if the sale and purchase had been entirely without reference to the Cimbria. Tyler v. Currier, 13 Gray (Mass.) 134. A mere purchase and sale of

these articles in New York without reference to any vessel would not be a maritime contract, and no lien enforceable in admiralty could arise from it. But in regard to these articles the parties dealt upon the common understanding that they were for the Cimbria, and their understanding was carried into effect.

7. The Cimbria made her first trip between Boston and Nahant June 7, 1906. She continued to run on that route, making one or more trips daily, until September 9, 1906. Her place of arrival and departure in Boston was Lincoln's Wharf. At Nahant a wharf was used which belonged to the Bass Point Company. The owners of both wharves have unpaid claims against the owner of the Cimbria, and both assert liens upon the steamer herself.

The Maine Coast Transportation Company controlled Lincoln's Wharf as lessee. By a written agreement executed June 12, 1906, it let the privilege of using the water front of the wharf at all times, the use of the waiting room thereon in common, the exclusive use of the ticket office thereon, and reasonable facilities for handling freight and express matter to the Bangor & Bar Harbor Steamboat Company, from June 9 to September 30, 1906, inclusive, for $2,000. The lessee was to observe certain conditions specified in the agreement. Among other things, it was to keep the lessor insured against loss or claim for damage to persons or property in the sum of $10,000. It was to pay for electric lights and for water at the same rate as the lessor, or else install its own lighting plant and its separate water meter. The $2,000 was to be paid in eight installments of $250 each, on specified dates throughout the season about 14 days apart. There was no mention of or reference to the Cimbria in the contract, nor to any other steamer. The lessee was free to bring to the wharf any vessel or vessels which it might be operating during the term of the agreement.

The lessee company made some payments during the season, but failed to pay all that was due from it. At the expiration of the agreed term it owed the petitioner $810.46. Its payments on account fell short of the $2,000 due for use of the wharf, waiting room, and ticket office privileges granted it by $486.75. $323.71 more was due for water, electric light, and cost of insurance.

That neither the cost of insurance nor the cost of electric light supplied to the wharf can, in any event, constitute a lien upon the Cimbria, is obvious without further remark. As to water, there is no proof that any was furnished to her, nor how much, if any. So far as the claim is for wharfage, the Cimbria was not the only steamer which made use of the wharf under the agreement of June 12th. The steamboat company operated another steamer, the Adelaide, on the same route between July 3d and September 1st, during which time she made alternate trips with those made by the Cimbria, and made the same use, when she was at Boston, of the privileges at Lincoln's Wharf which had been granted to the steamboat company under its contract with the petitioner. It was contended that the unpaid balance of the agreed rent was due for wharfage, that it might be apportioned between the two boats which used the wharf under the agreement, and that the Cimbria's part should constitute a lien upon her. It was claimed on the evidence that the Adelaide used the wharf one-third as

much as the Cimbria. This division between the two boats seems to me to rest on little more than guesswork; but, even if the exact length in time of the Cimbria's use of the wharf were ascertained, it would still be impossible to say that a corresponding proportion of the whole agreed rental was payable for wharfage furnished to her. The whole rental was to be paid, whether any steamer used the wharf or not; and what was to be furnished in return for it included much besides wharfage for the boat or boats which came there or had the right to come there. It would be wholly impossible to say what was due for wharfage, as distinct from what was due for the other accommodation to be furnished. These considerations would prevent a finding that the Cimbria became liable for any wharfage, even if the facts that the agreement contemplates no lien, so far as its terms show, and was an agreement made by the owner, then present in Boston, by its president and general manager, were not enough to prevent any such finding. The Advance (D. C.) 60 Fed. 766; The James T. Furber (D. C.) 129 Fed. 808; Steamboat Company v. Blake, 2 App. D. C. 51. This petition must be dismissed; the evidence failing to establish any lien upon the Cimbria in the petitioners' favor.

In the petition of the Bass Point Company, which, besides its wharf at Nahant, owned or controlled a hotel there, a lien is claimed for: (1) $1,000, "cash advanced for music for steamer Cimbria"; (2) "repairs to wharf for steamer Cimbria, $350"; (3) 350 life preservers and 150 camp stools, in all $387.50. The evidence is that the Cimbria's owner did agree, through Barbour, as a part of the arrangements made at the beginning of the season for running her between Nahant and Boston, to contribute the sum of $1,000 in 10 installments of $100 each, toward the cost of a band employed and paid by the petitioner to play on shore at the head of its wharf. The money is due according to the agreement. but it is too plain for argument that the Cimbria cannot in any event be held for it. Nothing was furnished to her for which a maritime lien could arise. The same is true of the cost of repairing the petitioner's wharf so as to make it safe for the Cimbria or the Adelaide to land or embark passengers there. As to the camp stools and life preservers, I find that Barbour, among his other dealings with the petitioner, bought these articles from it; that they were delivered to her June 14, 1906, at Nahant; that they were necessary for her equipment, and have never been paid for; and that the amount claimed is due for them. In regard to them, however, this petitioner stands in the same position as do the other petitioners who dealt with Barbour at Boston and furnished articles on his orders. Their claims are more fully discussed below. These dealings were dealings with the owner of the boat. There is no evidence upon which I can find that the minds of the parties ever met upon any common understanding that the Cimbria's credit was pledged for them. They were not dealings with the master in a foreign port where the owner was not present. The petitioner must be considered as having trusted to the expectation of being paid for these articles, as for the music and the wharf, out of the proceeds of the season's business. It has no right to charge the Cimbria with any part of its claim.

8. At various times during her employment upon the route between

156 F.—25

Boston and Nahant, the Cimbria was supplied by the petitioners below named with necessaries of one kind or another, and to those petitioners various amounts remain due for what was so supplied.

S. P. Blackburn & Co., of Boston, ship chandlers, furnished her with articles of ship chandlery, at different times in June, July, August, and September, 1906, to the amount of $259.20 in all. $150 was paid on account, leaving $109.20 due.

Staples Coal Company, of Boston, furnished her with coal as required from time to time, at a rate of $4 per ton agreed upon when she first arrived in Boston at the beginning of the season, between Barbour, whose relation to the vessel has already been described, and the petitioner's representative. The coal furnished in June, July, and part of August has been paid for. For what was furnished during the remainder of August and in September $287.56 is due.

P. Ahern & Co., of Boston, furnished her with groceries and provisions in August and September, 1906, for which $103.60 remains due them.

C. H. Buck & Co., of Boston, printers, furnished her in July and August, 1906, with printed tickets and folders, which I find to have been necessary for her use in the passenger business wherein she was at the time engaged, for which $53.60 remains due them.

Hunter & Brander, of Boston, repaired her electrical equipment in June, and again in August, 1906, supplying the necessary material, and for the work so done $22.10 remains due them.

When the articles furnished and work done by the five petitioners last above mentioned were contracted for, and also when the articles were delivered to or the work done upon the vessel, she was, in every instance, in a foreign port, so that the question whether the petitioners, or any of them, became entitled to a lien upon her, is to be settled by the maritime law and without regard to any state statute. The contract for what was delivered to or done upon the vessel was in no case with her master. It was in each case with H. W. Barbour, who had come to Boston on board her, and who throughout the time during which she continued to run on the Nahant route devoted himself to the business of maintaining steamboat service on that route. The ticket office on Lincoln's Wharf, above mentioned, he occupied as his office, and he was, generally speaking, to be found on shore during the day. He usually slept on board the Cimbria; but he did not, so far as appears, exercise on board her any of the powers or perform on board her any of the duties of a master. These were left to Capt. Crosby. Crosby commanded her on her trip from Bangor to Boston, as has been stated, and thereafter so long as she continued to run from there. He attended to her navigation and safe-keeping, also to her custom house business, which, indeed, could be transacted by him only, as he appeared on her papers as master. He does not appear to have taken any part whatever in ordering any supplies or repairs for her. These matters, and in general all matters on shore relating to her, to which a master in a foreign port where no owner was present would be expected to attend, were looked after by Barbour alone.

It follows therefore that, although each of these five petitioners has supplied necessaries to a vessel in a foreign port, there is no one of

them who has done so upon the order of the master in the owner's absence; on the contrary, in each case the owner was present in the foreign port, and the dealings were with him. The Maine corporation which owned the Cimbria was transacting its business, throughout the time of these dealings, where Barbour, its president, treasurer, and general manager, was, and he was all the time at Boston. If the petitioners did not know this to be the fact, the means of knowledge were so readily accessible to them as to make it impossible to hold that they are not chargeable with such knowledge. The fact was that they did not inquire. Under these circumstances, they cannot rely upon the mere fact that they have supplied the vessel in a foreign port, as they might have done had they dealt with her master in the owner's absence. The presumption is that they have relied solely on the credit of the corporation to which the Cimbria belonged; a presumption only to be overcome by proof of a common understanding with Barbour that they should have a lien upon the Cimbria for what they furnished. The Iris, 100 Fed. 104, 106, 40 C. C. A. 301; Cuddy et al. v. Clement et al., 113 Fed. 454, 51 C. C. A. 288; Id., 115 Fed. 301, 53 C. C. A. 94. I am unable to find in the evidence anything sufficient to prove such a common understanding in the case of any of them. No doubt, each and every one of them gave credit to the Cimbria so far as his own intentions were concerned, and would not have furnished what he did furnish unless he had believed he was acquiring a lien for it, and it is true that they all, or all who kept books, charged what they furnished in the usual way to the "Cimbria" or "Cimbria and owners"; but this, as is well settled, does not help their case. There is no evidence that in their dealings with Barbour the question of lien was ever raised or referred to either expressly or by implication, except in the case of the Staples Coal Company. A representative of this company, in a conversation about the amount due it, told Barbour, on August 31st, that unless they got their money they would have to enforce their lien. But there was no assent by Barbour to the claim that they had a lien save by silence, and, as he then made a payment on account, there was no further talk about the matter. A small portion only of the coal furnished was delivered after this conversation, and I am unable to regard what was then said as establishing, even as to that portion, an agreement by the owner that it should be furnished on the vessel's credit. See Whitcomb v. Metropolitan Coal Co., 122 Fed. 941, 59 C. C. A. 465.

The payment then made to the coal company on account was by check on a Boston trust company, signed by Barbour as treasurer of the Bangor & Bar Harbor Steamboat Company. The same petitioner had previously accepted from Barbour several similar checks. Similar checks were also accepted at various times during the season, from Barbour, by the other petitioners, Blackburn & Co., Buck & Co., and Ahern & Co. These checks afford further ground for the conclusion that the petitioners knew, or must be considered as having known, that they were dealing with the owner, and that they cannot claim the rights which belong only to those who deal with the vessel in the owner's absence.

9. The Almy Water Tube Boiler Company, already mentioned above, furnished fire brick for the front of the Cimbria's boiler, and side sections for the boiler, for which is due in all $98.16. These articles were ordered by letters from Boston dated July 16 and August 13, 1906. The letters were written under the direction of H. W. Barbour by George H. Barbour, his brother. Like the articles ordered from the same petitioner in May, while the vessel was at Bangor, these articles were shipped by Barbour's direction from Providence by rail. They were received by Barbour in Boston on behalf of the Cimbria's owner, were at once put in position on board her at Boston, and thereafter used on board her. The understanding of both parties was that the articles were destined for and to be used on the Cimbria, and they were necessary supplies for her. In one of the letters referred to, the petitioners were directed to charge the articles ordered to the steamboat company. They were, however, charged to the "Cimbria and owners."

The articles referred to cannot, in my opinion, be regarded as having been "furnished" to the Cimbria in the sense of the maritime law, either at Providence or at Boston. The question has been discussed above, in connection with the other articles sent by this petitioner to Bangor. But, even if they can be so regarded, this petitioner stands no better than do the other petitioners who furnished supplies at Boston so far as a lien is concerned. It must be regarded as having dealt with the owner, not as having relied on the credit of the vessel. This part of its claim is therefore not secured by a lien upon the vessel.

10. Capt. W. M. Crosby, who commanded the vessel, as has been stated, was paid off as master on September 9, 1906, for all services to and including that day. On the following day, the steamer was taken to Lockwood's Wharf and laid up. On the same day (September 10) the crew left her. On September 11th she was arrested upon the warrant issued in this case. During the two days September 10th and 11th until the marshal assumed charge, Crosby was the responsible person in charge. Barbour requested him to take her to Lockwood's Wharf, and told him to stay aboard her until something was done. His claim that he piloted her to Lockwood's Wharf, and attended to making her fast there, and her safety while there, is not disputed. He claims $6.66, which is at the same rate as his pay while master before September 9th. I think I am justified in regarding these services, preceding, as they did, the final laying up of the boat, as maritime, and in holding that his claim for them is good against the vessel.

The result is that decrees are to be entered in the amounts below stated in favor of the petitioners below named: D. Kahnweiler's Sons, $100; Almy Water Tube Boiler Company, $208.16; Penobscot Machinery Company, $100; Snow & Nealley Company, $72.34; Thomas F. Gallagher, $1,904.92; W. M. Crosby, $6.66; E. & I. K. Stetson, $100.92. The above petitioners are also to recover interest on the above amounts from the date of filing of their respective petitions to the date of the sale of the Cimbria, but not after that date, in view of the fact that no interest has been accruing upon the proceeds in court. They are also to recover their taxable costs. If, after satisfying the

decree in favor of the original libelant, the proceeds remaining in court are insufficient to satisfy the decrees in favor of all said petitioners in full, all said decrees, except that in favor of Thomas F. Gallagher, are to be first satisfied in full, and the proceeds then remaining are to be applied toward satisfying the decree in his favor. If, after satisfying in full all the decrees in favor of all said petitioners, including said Gallagher, there shall remain any balance of said proceeds, such balance is to be paid over to the Veazie National Bank of Bangor, mortgagee of said steamer Cimbria. All the other petitions filed against said proceeds, viz., those of S. P. Blackburn & Co., Staples Coal Co., Bass Point Co., Maine Coast Transportation Co., P. Ahern, C. H. Buck & Co., and Hunter & Brander, are to be dismissed.