## NORTHWESTERN FUEL CO. v. DUNKLEY–WILLIAMS CO.

(Circuit Court of Appeals, Seventh Circuit.    October 5, 1909.)

### No. 1,529.

1. MARITIME LIENS (§ 30*) — SUPPLIES FURNISHED TO CHARTERER — CIRCUMSTANCES AMOUNTING TO NOTICE OF CHARTER.

One furnishing coal to a steamer on the order of a charterer, designated as "Chicago & Milwaukee Line," which was not a name, but merely a designation of the class of traffic the steamer was then engaged in, without inquiry as to the fact and terms of a charter, but in the belief that the vessel would be held in any case, is not entitled to a maritime lien, where any inquiry would have disclosed the charter and its terms, which required the vessel to be returned free from liens, and especially where the owner promptly mailed a letter to the lien claimant, notifying it of the

---

*For other cases see same topic & § NUMBER in Dec & Am. Digs. 1907 to date, & Rep'r Indexes

charter, thus showing its own diligence in the premises, although receipt of the letter was denied. · .

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 37, 38; Dec. Dig. § 30.*]

2. MARITIME LIENS (§ 28*) — SUPPLIES FURNISHED TO CHARTERER — RIGHT TO LIEN.

A provision in a charter party, which required the vessel to be returned free from liens, that the charterer should not permit liens to be created in excess of $1,000 at any one time, a violation of which should entitle the owner to take possession, was for the benefit of the owner, and does not entitle one furnishing supplies to the charterer without inquiry to claim a lien to the extent of the $1,000.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 46, 47; Dec. Dig. § 28.*]

Appeal from the District Court of the United States for the Eastern District of Wisconsin. ·

Libel in admiralty by the Northwestern Fuel Company against the steamer Petoskey; the Dunkley-Williams Company, claimant. Decree for libelant, for less than amount claimed, and libelant appeals. Affirmed. ·

The appellee, owner of the steamer Petoskey, chartered her to the Chicago Transportation Company from May 1, 1906, until December 10, 1906, for a consideration of $5,000. The charter party provided that second party thereto should pay promptly all of the running expenses of the steamer, and not permit her to be under debts constituting a lien upon her for more than $1,000 at any time. It further provided that for a breach of said last-named covenant, or any other of the conditions of the charter party, appellee might at once take possession of the Petoskey, operate her for the account of the second party thereto, holding second party liable for the amount of the excess of the consideration reserved over and above what might be realized from her earnings. It was further thereby provided that at the expiration of the charter party the steamer should be returned in as good condition, less ordinary wear, etc., as when received, and that at the time of such return she "shall be free and clear of all liens and incumbrances whatsoever created by the party of the second part, or its agents or employés, for which the said party of the second part was to be liable, or which it was to bear." It was also provided in said charter party that second party should save harmless appellee from expenses incurred in defending against liens and otherwise. The Chicago Transportation Company thereupon took possession of the Petoskey and engaged her, together with the steamer Peerless, in carrying passengers and freight between Chicago and Milwaukee, until October 10, 1906, when appellee took possession of her for breach of charter party. The indemnity bond required by the charter party was never furnished, though often asked for. At the time of the default liens to the amount of $1,500 had accrued. On May 23, 1906, Miles E. Barry, for the second party to the charter party, signing himself "V. P. and G. M.," wrote appellant, under letter head "Chicago & Milwaukee Line," asking for its best price on coal for the steamer Peerless and Petoskey; "we to go to your dock after the coal." Appellant replied May 24, 1906, naming price and other information. On June 4, 1906, appellee mailed a letter to appellant, advising the latter of the charter party, of which letter appellant denies all knowledge. No further steps were taken, save that coal was delivered to the steamer from time to time at appellant's dock and charged to steamer Petoskey, and payments therefor were duly made on bills sent by appellant to "steamer Petoskey, c/o Chicago & Milwaukee Line," at the end of each month up to the month of August, 1906.

The libel was filed to recover for the deliveries of August, September, and up to October 15, 1906, amounting to the sum of $1,621.80. On hearing in the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

District Court the lien was disallowed for all coal delivered up to October 15, 1906, and sustained as to deliveries on that day, amounting to the sum of $75.75, with interest from November 15, 1906, amounting to $7.96, and costs, amounting to $83.80, from which order this appeal was taken. The errors assigned are: That the court erred in not allowing judgment to go for appellant for the whole amount claimed; that the court erred in holding that under the allegations of the libel and the evidence, respectively, appellant was chargeable with notice that the steamer was operated by the Chicago Transportation Company under charter; that the court erred in holding that the circumstances were· such as to charge appellant with notice of the charter party; that the court erred in not holding that under the charter party, even conceding notice to appellant that by the terms thereof the charterer was not authorized to pledge the vessel for supplies to the amount of $1,000, yet under the circumstances the steamer was liable to appellant to the amount of at least $1,000.

A. E. Boyesen, for appellant.
Charles E. Kremer, for appellee.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). The test of liability herein is conclusively stated by the Supreme Court in the case of The Valencia, 165 U. S. 261, 17 Sup. Ct. 323, 41 L. Ed. 710, as follows, viz.:

"One furnishing supplies or making repairs on the order simply of a person or corporation acquiring the control or possession of a vessel under such a charter party cannot acquire a maritime lien, if the circumstances attending the transaction put him on inquiry as to the existence and terms of such charter party, but he failed to make inquiry, and chose to act on a mere belief that the vessel would be liable for his claim."

It appears that libelant delivered the coal under the impression that the vessel would be liable therefor in any case. This accounts for its lack of diligence in making investigation as to the facts. The credit was not given to protect the owner's interest in the steamer, but that of parties for the time being operating the boat. Therefore the question for the court to pass upon is whether libelant had actual knowledge, or was chargeable with knowledge, of the charter party between appellee and the Chicago Transportation Company. The term "Chicago & Milwaukee Line" seems to have been merely descriptive of the class of traffic the Petoskey was engaged in, and did not constitute a name. This was of itself a circumstance calculated to raise inquiry. Any effort on the part of libelant to ascertain why the owner of the steamer should operate under such a phrase would have resulted in the discovery of the charter party and its terms. Nothing short of fatuous confidence in the liability of the steamer for supplies under all conditions can explain the failure to make investigation. Moreover, appellee introduces evidence to the effect that notice of the charter party was mailed to libelant. The latter denies receiving any such letter. While this may not be conclusive proof of notice as against libelant, it relieves appellee from all suspicion of negligence in the premises, if any would otherwise attach. That no evidence is adduced as to notice to other furnishers of supplies is not persuasive, since the item of coal would be the first to be looked after. We deem it clearly

shown that whatever negligence there was in the premises was that of libelant.

The attempt to construe the language of the charter party so as to give libelant the benefit of the clause prohibiting liens to accumulate in excess of $1,000 we deem without merit. Appellee was entitled under the agreement to receive the Petoskey free of all liens. The $1,000 clause served its mission when it placed it within the power of appellee to enforce the forfeiture clause. It was evidently placed in the charter party for the benefit of appellee, and not for the solace of those furnishing supplies without reasonable investigation as to responsibility. It is difficult to understand how an owner could protect himself against parties furnishing supplies without using due diligence to ascertain the facts, unless it be required that he do as appellant suggests: Paint a notice upon the vessel—a method which does not commend itself to our judgment. This opinion is not at variance with that of Judge Putnam in the case of The Surprise, 129 Fed. 873, 64 C. C. A. 309, since here we find that libelant was put upon notice of the charter party.

The finding of the District Court is affirmed.

NOTE.—The following is the opinion of Quarles, District Judge, in the court below:

QUARLES, District Judge. This is a libel of the steamer Petoskey to recover for coal furnished to said steamer by said libelant at Milwaukee, a foreign port, between the 6th day of August and the 16th day of October, 1906. There is no dispute that the coal was furnished and that the prices charged therefor were reasonable.

It appears that on the 21st day of April, 1906, a charter party was entered into between Dunkley-Williams Company, of Chicago, the owner and present claimant of the steamer Petoskey, and the Chicago Transportation Company, of Chicago, Ill., whereby the latter chartered the steamer from May 1, 1906, to December 10, 1906. By the seventh section of the charter party it was provided that during the life of the charter party the charterer "shall promptly pay all of the running and operating expenses of the steamer, and shall not permit her to incur debts for amounts constituting a lien upon her for more than a thousand dollars at any one time." It was also provided that at the end of the season the steamer should be returned to the owners free and clear of all liens, and that the owners should be saved harmless from any costs or expenses. The charterer operated the steamer, together with the steamer Peerless, under the designation "Chicago & Milwaukee Line." This line was operated between Chicago and Milwaukee until October 9th, when the owners resumed possession of the steamer Petoskey, owing to the default of the charterer. The charter party provided for a bond of indemnity to protect the owners and the same was frequently demanded, but never given. The charterers defaulted, and the steamer was subject to $1,500 of liens when returned to the owners.

The evidence shows that the steamer Petoskey came to the dock of the libelant at Milwaukee on the 11th day of May, 1906, and applied for coal to enable her to make her regular trip to Chicago. There was no agreement for any lien on the vessel, nor any definite agreement of any kind. Mr. Graham, the city agent of libelant at Milwaukee, was notified of the request, and instructed his employés at the dock by telephone to deliver coal to her, and this was done regularly from day to day as she made her trips. The engineer usually signed the receipts for coal, but sometimes such receipts were signed by the captain; the same being charged on the books of the libelant to the steamer, care of Chicago & Milwaukee Line. On the 23d of May the following

letter was received by the libelant from Mr. Barry, general manager of the Chicago & Milwaukee Line.

"J. G. Keith, President.            A. C. Helm, Secretary and Treasurer.
"Miles E. Barry. Vice President    J. A. McCaulay, Auditor.
    and General Manager.

"Chicago Milwaukee Line Steamers.
"Chicago & Milwaukee Line
"The 'C. & M.' Line.

"E. F. Daly, Gen'l Ft. and Pass. Agt.,
    Milwaukee, Wis.
"W. H. Ogborn, Ass't Gen'l Frt. and
    Pass. Agt., Chicago.
"Jos. Goebel, Agent, Chicago.

    "Milwaukee Office and Docks: East Water St. Bridge. Telephone
               South 915.

    "Chicago Office and Docks: North End Clark St. Bridge. Telephone
               Central 2586.

                                  "Chicago, May 23, 1906.

"Northwestern Fuel Co., Milwaukee, Wis.—Gentlemen: I wish you would name me your best price on the run of pile coal for the steamers Peerless and Petoskey. We to go to your dock after the coal. Would thank you to let me hear from you by return mail.

    "Yours truly,                Miles E. Barry, V. P. & G. M.
"MEB/T."

This letter was answered by the libelant on the following day, as follows:

                               "Milwaukee, Wis., May 24, 1906.

"Miles E. Barry, Vice Pres. Chicago Milwaukee Line, Chicago, Ill.—Dear Sir: Replying to yours of May 23, the present price of run of pile coal put on board your steamers at our dock is $3.15 per ton. If you know how much coal you will need from now to April 1, 1907, we will contract to furnish you that amount at $3.40 per ton, giving you the benefit of our spot delivery price so long as such price remains lower than the contract price, namely, $3.40. Under a contract at $3.40, you would now buy coal at $3.15, and continue to buy it at that price so long as the spot delivery price remains at that figure, and so on up to $3.40. This guarantees you a price to April 1, 1907, not to exceed $3.40. Hoping to receive a favorable reply, we remain,

    "Yours truly,                Northwestern Fuel Co.,
                                "H. C. Graham, City Agt."

To this letter there was no response. Mr. Graham, the city agent of libelant, has a book which contained the names of all the steamers on the Great Lakes, together with the names and addresses of the owners thereof. When application was made by the Petoskey for coal, Mr. Graham consulted this book and learned the fact that Dunkley-Williams Company, of Chicago, were the owners. He knew that the Petoskey was running in the Chicago & Milwaukee Line. Accounts for coal furnished were regularly rendered each month by libelant to the "Chicago & Milwaukee Line," and such accounts for the months of May, June, and July were paid by checks signed by Barry, vice president and general manager of said line. Libelant made no inquiries to ascertain whether the steamer was chartered, or whether Dunkley-Williams Company were interested in the Chicago & Milwaukee Line. Mr. Graham, who did all the business for the libelant, testifies frankly that until the Chicago & Milwaukee Line defaulted, late in the season, he supposed that the vessel was herself responsible for all needed supplies that were furnished, without regard to ownership. He gave credit to the vessel upon the supposition that he would have a lien upon her in any event. The case must be ruled by The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

It is strenuously insisted in argument that The Surprise, 129 Fed. 874, 879, 64 C. C. A. 309, rules this case. In many of its features that case is similar,

but there is one distinguishing fact which counsel overlook. In The Surprise the furnisher dealt only with the master and his subordinates, and there appeared no fact inconsistent with the presumption that he was giving credit to the vessel. Up to the time that negotiations were opened between libelant and the Chicago & Milwaukee Line, the two cases were almost parallel, and if the same course of dealing had continued here, the doctrine of that case would be potential. But the correspondence between libelant and the owner pro hac vice, and the subsequent rendition of monthly statements to the Chicago & Milwaukee Line, and monthly payments by them for May, June, and July, indicate clearly to my mind that libelant extended credit to the Chicago & Milwaukee Line. No special contract resulted; but what may be called a tacit understanding may be gathered from the transaction, which is as destructive in its influence as a specific agreement. It showed the acceptance by libelant of the Chicago & Milwaukee Line as the paymaster. In every receipt given by the vessel for coal reference was made to the Chicago Line. The fact that the account on the books of libelant was kept with the steamer Petoskey is of very little significance under the authorities. The following cases deal with circumstances which are held prima facie to show an intent to give credit to the charterer: The William Cook (D. C.) 12 Fed. 919; The Samuel Marshall, 54 Fed. 396, 4 C. C. A. 385; The Stroma, 53 Fed. 281, 3 C. C. A. 530; The Geo. Dumois (D. C.) 66 Fed. 353; The Cimbria (D. C.) 156 Fed. 378, 387; The Gen. Dumont (D. C.) 158 Fed. 312.

Mr. Graham, the agent of libelant, knew before August, when the Chicago & Milwaukee Line first made default in payment, that Dunkley-Williams Company were the owners of the steamer Petoskey; that their place of business was 7 Rush street, Chicago, Ill.; that the Chicago & Milwaukee Line was operating the steamer; that this line had an office in Chicago, and also one in Milwaukee; that this line had negotiated for coal for the steamer for the season, although no explicit contract was closed; that for three months this line had paid the steamer's bills. These facts were amply sufficient to put him upon inquiry, and certainly would have induced a prudent man, supposed to have a knowledge of the law, to investigate the circumstances. The difficulty in the case arose from the fact that Mr. Graham was lulled into security by the popular notion that the furnisher of necessary supplies was entitled to a maritime lien upon the vessel in any event. This supposition accounts for everything that happened. He must be presumed to have known the law. It would be intolerable to allow one to predicate a claim of this nature upon his own ignorance or indifference. The owners knew nothing of the credit thus extended by libelant to the vessel. They endeavored to notify libelant seasonably in June by letter of the exact situation. Libelant claims that such letter was never received. Under the view I have taken, it is immaterial whether the presumption of its receipt was successfully rebutted. It indicates the good faith of claimant in the premises.

Under the facts the libelant and claimant appear on this record as two innocent parties, and the old maxim obtains that in such case he must suffer whose negligence was responsible for the loss. It is plain that libelant was chargeable with such knowledge as he would have acquired if he had made the necessary investigation. The Lulu, 10 Wall. 192, 204, 19 L. Ed. 906. Mr. Graham had merely to call up the Chicago & Milwaukee Line by telephone, or to address a letter to Dunkley-Williams Company at Chicago, to ascertain the existence and the terms of the charter party. Good faith required this.

A persuasive argument is made by libelant as to the construction and effect of the peculiar clause in the charter party—"and shall not permit her to be in debt for amounts constituting a lien upon her for more than the sum of one thousand dollars at any time." It is contended that if the libelant, being put upon inquiry, had examined the charter party, he would have been justified in construing this clause forbidding the charterer to incur liens exceeding $1,000 in amount as an implied consent to liens up to that amount, and that, as there is no evidence that any liens had accrued up to the time this coal was furnished, it could not be held a fraud upon the owners to rely upon the security of the vessel within the limits thus fixed by the owners. This argument is specious, but not sound. The clause in question was inserted for the protection of the owner as against the charterer. It required the payment of claims by the charterer before they exceeded the limit. It is calculated to

enforce the duty imposed by the antecedent clause. It was not inserted for the benefit of third parties as a foundation of a claim upon the vessel. The real question for the furnisher to determine primarily was who was bound to pay the coal bills. This question is effectually set at rest by the language of the seventh article of the charter party: "That for and during the life of this charter party, the said party of the second part (the charterer) shall promptly pay all of the running and operating expenses of said steamer." On learning of this obligation on the part of the charterer, the duty of the libelant was plainly to deal with the charterer, and by that course only could it keep faith with the owners.

The language of Mr. Justice Harlan in The Valencia is equally applicable here: "We mean only to decide at this time that one furnishing supplies or making repairs on an order simply of a person or corporation acquiring the control and possession of a vessel under such a charter party cannot acquire a maritime lien, if the circumstances attending the transaction put him on inquiry as to the existence and terms of such charter party, but he failed to make such inquiry and chose to act upon a mere belief that the vessel would be liable for his claim."

This conclusion, predicated upon similar facts, is reached by Judge Lowell in the case of The Underwriter (D. C.) 119 Fed. 713, after a most thorough review of all the authorities. Judge Seaman gave his sanction to the same doctrine in The C. W. Moore (D. C.) 107 Fed. 957. See, also, The Goldenrod, 151 Fed. 6, 80 C. C. A. 246, and The Wm. P. Donnelly (D. C.) 156 Fed. 302, which follow and perhaps expand the rule laid down by the Supreme Court.

Therefore my conclusion is that the libelant is not entitled to a maritime lien, except only for coal furnished after the 9th of October, when the claimant took over the steamer. This amount appears to be $75.75, for which amount, with interest thereon and costs, the libelant is entitled to hold the steamer.