## THE ANNA E. MORSE.

### UNITED STATES v. HENDERSON et al.,
### and four other similar cases.

(Circuit Court of Appeals, Third Circuit. December 5, 1922. Rehearing Denied March 13, 1923.)

#### Nos. 2865–2869.

1. **Maritime liens ☞28—Person intrusted with ship presumed to have authority to contract liens, unless furnisher could have ascertained limitation on authority.**

   Under Merchant Marine Act June 5, 1920, § 30, subsecs. P–T, the law presumes that one intrusted with a ship has the owner's authority to procure supplies on the pledge of the ship, unless the owner had withheld his authority and the furnisher knew it, or by diligence could have ascertained it.

2. **Maritime liens ☞30—Reference to contract in letter ordering supplies held to put furnisher on inquiry.**

   Where one of the letters, out of which an order for supplies for a vessel grew, stated that some of the vessels were United States Shipping Board vessels, the furnisher of supplies was put on inquiry to ascertain whether the party ordering the supplies was without authority to bind the vessels.

3. **Maritime liens ☞28—Agency contract held not to restrict agent's authority to procure supplies on ship's credit.**

   A contract between the Emergency Fleet Corporation and an agent for the operation of the ships, requiring the agent to provide and pay for all

provisions, equipment, and supplies, and perform all customary duties of managing and operating owner, but containing no provision withholding authority to procure supplies on the credit of the ships, was insufficient to defeat the authority presumed by the law to order supplies on such credit under Merchant Marine Act June 5, 1920, § 30, subsecs. Q and R.

**4. Maritime liens ⬅⟹30—Contract identifying ships as those intrusted to agent held not to give notice of restriction of authority.**

Where the furnisher of supplies to ships was informed some of them belonged to the Emergency Fleet Corporation, and thereby charged with knowledge of an agency contract, whereby the corporation intrusted certain of its vessels to an agent, who ordered the supplies, and in ascertaining whether the vessels for which the supplies were furnished were covered by the agency contract, could have learned that the agent held them under the terms of an agreement pending purchase, the contract for purchase, of which they were thereby given knowledge, and which involved complicated transactions between the shipbuilder, the United States Shipping Board, the Emergency Fleet Corporation, and the agent, *held* not to charge the furnisher of supplies with knowledge of any limitation on the authority of the agent to order the supplies on the ship's credit.

**5. Maritime liens ⬅⟹30—Reference to proposed terms of contract of sale never executed does not charge furnisher with knowledge of restrictions on agent's authority.**

A reference, in a contract under which an agent had possession of ships, to a proposed contract of sale which would be entered into in the future, but which was never executed, does not charge the furnisher of supplies with knowledge that the agent's authority to order supplies for the ships on the ships' credit was restricted to the extent it would have been, if the contract of sale had been executed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Five separate libels in admiralty by Norris E. Henderson and others, trading as the Phœnix Paint & Varnish Company, against the United States, as owner of five different steamships, to wit, the Anna E. Morse, the Colin H. Livingstone, the Jennie R. Morse, the E. A. Morse, and the H. F. Morse, to recover for supplies furnished to the ships while they were being operated by the United States Transport Company, Inc. Decree for the libellants in each case, and respondent appeals. Affirmed.

George W. Coles, U. S. Atty., and Joseph L. Kun, Sp. Asst. U. S. Atty., both of Philadelphia, Pa. (F. R. Conway, of Washington, D. C., of counsel), for the United States.

Lewis, Adler & Laws, of Philadelphia, Pa. (Otto Wolff, Jr., of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. These actions were brought by the Phœnix Paint & Varnish Company, a copartnership, against the United States of America, as owner of the several ships named in the caption, for supplies furnished them while being operated by the United States Transport Company, Inc. They were instituted by libels in personam and prosecuted, as if in rem, in the manner provided by the Suits in Admiralty Act of March 9, 1920, 41 Stat. chapter 95, page 525, ex-

⬅⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

empting vessels owned by the United States and its agencies from seizure in-admiralty causes. As they arose out of the same facts and involve the same questions of law we shall dispose of them in one opinion.

The actions were founded on the Act of June 23, 1910 (36 Stat. chapter 373, page 604, Comp. St. §§ 7783–7787), as re-enacted in the Merchant Marine Act of June 5, 1920, 41 Stat. page 988, chapter 250, section 30, subsections P, Q, R, S, and T. At the trial the libellants introduced evidence that they had furnished supplies to five ships owned by the United States and in the operation of the United States Transport Company, and maintained that the United States Transport Company was, within the terms of the statute, the "person to whom the management of the [vessels] at the port of supply [had been] intrusted" and as such was "presumed to have authority from the owner to procure" supplies and necessaries. The Yankee, 233 Fed. 919, 147 C. C. A. 593; The Penn (C. C. A.) 273 Fed. 990. In defense, the United States introduced a number of contracts of confusing details covering the building of the ships by the Virginia Shipbuilding Corporation, the financing of their construction by the United States Shipping Board Emergency Fleet Corporation, the adjustment of disputes, conveyance of title of the ships to the United States of America, delivery thereafter to the United States Transport Company for operation pending a proposed sale to the Shipbuilding Corporation, on which it (the United States) based the contention, not exactly that it was not the owner of the ships for which the supplies had been furnished, for the title papers were against this position, but that the Transport Company was operating the ships, not for it, but for the Virginia Shipbuilding Corporation. The issue was so framed that, on facts to be mentioned presently, a finding that the ships were operated for the United States would sustain the libels, or a finding that they were operated for the Virginia Shipbuilding Corporation would defeat the libels. The District Court found against the United States and entered decrees for the libellants. The cases are here on the respondent's appeals.

In reviewing the complicated facts of these cases it should be understood that they are not actions between the United States, the United States Shipping Board Emergency Fleet Corporation, the United States Shipping Board, the Virginia Shipbuilding Corporation, the United States Transport Company, Inc., or any of them, arising out of .contracts for building ships and advancing money. They are simple actions in admiralty brought against the United States by one furnishing its ships with supplies. Also, it should be noted that the libellants at the time they furnished the supplies were wholly uninformed of the situation between the United States and its several agencies. They came on the scene as strangers. Still another matter of importance is to determine at what point in this complicated controversy we should enter in order to find and follow the issue raised by the libellants. The proctors for the United States began at the first historical stage of the transactions between the Emergency Fleet Corporation

and the Virginia Shipbuilding Corporation and followed them down into and through the litigation. This chronological order perhaps has advantages, but it tends to add to the confusion by placing the libellants in company with a group of corporations at a time and under circumstances with which they had nothing to do. Therefore, having in mind that the libellants brought these suits in admiralty under a statute enacted specially for the protection of persons in their situation, we think the place at which to start is where the libellants started and where also the law starts.

[1] The libellants began by furnishing supplies, concededly necessaries, to five ships in the operation of the United States Transport Company, upon its order, made with authority from the owner, presumed by statute, to procure the supplies on the credit of the ships. It cannot be questioned that, upon the face of this transaction so far as it has been stated, the libellants had a right to assume that the Transport Company was the person to whose management, within the terms of the statute, the ships had been entrusted at the port of supply, and that, as such, it was clothed with authority by the owner to procure supplies, under a presumption which the law, in its modern policy, makes in favor of the person furnishing them. But the law goes farther and provides that, notwithstanding this liberal provision for one furnishing supplies, it shall not—

"be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies or other necessaries was without authority to bind the vessel therefor."

Thus, speaking broadly, the law presumes the owner's authority in one entrusted with a ship to procure supplies on the pledge of the ship, unless the owner has withheld his authority and the furnisher knew it or by diligence could have ascertained it. The Havana, 64 Fed. 496, 12 C. C. A. 361; The Yankee, 233 Fed. 919, 147 C. C. A. 593; The Oceana, 244 Fed. 80, 156 C. C. A. 508, certiorari denied, see Morse Dry Dock & Repair Co. v. Conron Co., 245 U. S. 656, 38 Sup. Ct. 13, 62 L. Ed. 533; The Dana (D. C.) 271 Fed. 356; Northwestern v. Dunkley, 174 Fed. 121, 98 C. C. A. 95; The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710; The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Huron (D. C.) 271 Fed. 781. The exception to the remedy which the law affords one furnishing supplies is operative only when by reason of some circumstance he either knew or by diligence could have ascertained that the person ordering the supplies was without the authority of the owner which otherwise the law presumes.

[2] The United States urges, quite correctly we think, there is in these cases one such circumstance which, at the threshold, imposed upon the libellants the duty of inquiry. It was a letter dated March 30, 1920, written by the Transport Company to the libellants, out of which grew the order for supplies. The material parts are as follows:

"We desire to know whether you wish to furnish us with list prices of paint for vessels under our operation. Part of this fleet are United States

Shipping Board vessels and part belonging directly to this company. Upon the vessels belonging to the Shipping Board, payment for their bills will be prompt, that is, within approximately ten to fifteen days; upon vessels owned directly by us it will be slower, credit of possibly sixty days in some cases."

Clearly this was notice to the libellants diligently to ascertain whether the Transport Company, "because of a charter party, agreement for sale of the vessel, or for any other reason," "was without authority to bind the [vessels]" of the United States Shipping Board for the supplies it was about to order. The libellants made no such inquiry. This was a mistake.

[3] But the matter can not stop here for the next question is, what would they have found if they had inquired? This: They would have found a contract between the United States of America, "represented by the United States Shipping Board Emergency Fleet Corporation," on the one part, and the United States Transport Company, Inc. on the other part, bearing date the thirteenth day of March, 1920, and known as agency contract MO3. This contract was entered into only a few days before the quoted letter from the Transport Company putting the libellants on inquiry. If they had read it the libellants would have found that therein the United States described itself as "owner of certain vessels" and the Transport Company as "managing agent"; that the Fleet Corporation appointed the Transport Company "its agent for the management, operation, and conduct of the business of such vessels as it has assigned and may assign to" it; that the Transport Company, "the agent," agreed to provide and pay for all provisions, equipment and supplies, perform all customary duties of a managing and operating owner of the vessels, collect all freights and moneys arising out of their management and operation and deposit the same on behalf of the Emergency Fleet Corporation as a separate trust fund in the name of that corporation; and that the Transport Company "shall be paid an agent's fee, and a commission, as stated."

In searching this contract for lack of authority on the part of the Transport Company to procure supplies on the credit of ships assigned to it, the libellants would have found no provision whereby the United States, as owner, had withheld authority from the Transport Company to procure supplies for the ships it had entrusted to its management. Therefore, at this stage the Transport Company remained vested with authority presumed by the law to order supplies upon the credit of the ships, Act of June 5, 1920, § 30, subsections Q and R, 41 Stat. 1005; The South Coast, 251 U. S. 519, 40 Sup. Ct. 233, 64 L. Ed. 386; The Bronx, 246 Fed. 809, 159 C. C. A. 111; The Dana (D. C.) 271 Fed. 356; and the libellants had a right to furnish the supplies upon the credit of the ships—if the ships for which the supplies were furnished were actually of the number assigned, or to be assigned, under the contract.

[4] In identifying the ships in question with those of the contract of agency the libellants, had they inquired, would have found that the Transport Company had received the five ships here in litigation and in return had given the Emergency Fleet Corporation "delivery receipts," indicating that it had received the several ships and had en-

tered them "under the terms and conditions of the Agency Agree-
ment for Managing and Operating Steel Cargo Vessels * * *
(pending purchase), * * * said agreement having been executed
March 13, 1920." But these receipts did more than identify the ships
as of the number embraced within the MO3 agency contract. It told
them that the ships were accepted by the Transport Company for
operation "pending purchase." What purchase? Here, obviously,
was another circumstance which imposed upon the libellants the duty
under the statute to examine farther into the Transport Company's
authority to bind the ships or hold the owner for supplies. This the
libellants failed to do; but if they had done it, what would they have
found? They would have found a confusion of transactions involving
war shipbuilding and financing. These transactions we shall give
only in outline, bringing into view only such parts as bear on the title
of the ships here in question. They are these:

During the war the United States Shipping Board Emergency Fleet
Corporation entered into a contract with the Virginia Shipbuilding
Corporation for the construction of twelve ships by the latter concern
mainly with moneys to be advanced by the former. The end of the
war found the ships in various stages of incompletion and the Ship-
building Corporation indebted to the Fleet Corporation in something
over $12,000,000. With the need of more money with which to com-
plete the ships, arrangements were entered into whereby the Fleet
Corporation promised to make further advances. This is where the
trouble began.

These re-financing transactions are covered by two contracts. The
first, bearing date September 25, 1919, was between the Virginia
Shipbuilding Corporation and the United States Shipping Board
Emergency Fleet Corporation and the United States Shipping Board,
the latter two parties "representing the United States of America."
This agreement is entitled "Adjustment Agreement to be Attached to
Contract No. 145SC," the original contract for the construction of
the ships. As the original contract is not in the record we assume it
would have given the libellants no information if they had examined
it. If, however, they had examined the Adjustment Agreement of
September 25, 1919, they would have found that the Shipbuilding Cor-
poration, under its original contract, had been and still was engaged
in constructing ships for the Fleet Corporation; that it needed money
with which to complete them and demanded money in adjustment of
certain differences arising out of the original contract; that to this end
a sum was allowed by the Fleet Corporation and accepted by the Ship-
building Corporation; that to pay off its indebtedness to the Fleet Cor-
poration the Shipbuilding Corporation agreed to purchase and the
United States Shipping Board *to sell* three ships then completed and
five ships then under construction at the price of $225 per D. W. T.
less certain credits, net earnings of the ships when put in commission
to be applied to payment on the purchase price; and that when the
"closing dates" arrive, the parties *would enter* into contracts *of sale,*
the terms of which "shall be the same as under the present standard

form of purchase agreement and mortgage adopted by the Shipping Board."

[5] This reference to the standard form of purchase agreement adopted by the Shipping Board as the terms of the proposed contracts of sale ultimately to be entered into under the agreement of September 25, 1919, might, perhaps, have been notice to the libellants to travel still farther into the transactions between these several governmental agencies and ascertain if there were anything there affecting their right to furnish supplies on the credit of the ships. If they had procured a copy of this standard form of purchase agreement and had examined it they would have discovered that it contained the very thing which, if acted upon, would have annulled their right to libel the ships for supplies, or to proceed, as in these cases, against the owner in personam. This is a provision in the standard form of agreement, being section 6, subsection (f), which reads as follows:

"From the time of delivery by the seller of the bill of sale of said vessel, and until the payment in full of the notes to be given the buyer, and until the performance of all other obligations of the buyer hereunder, the buyer agrees, * * * that the buyer's right, title and interest in said vessel is subject to said mortgage and to this agreement, and that the buyer has no right, power or authority to suffer or permit to be imposed on or against said vessel any liens or claims which might be deemed superior to, or a charge against, the interest of the seller in said vessel."

On this undertaking by a buyer of a ship, after receiving bill of sale, to protect the mortgage on the ship against superior liens mainly rests the case of the United States. It contends that here the owner clearly withheld authority from the agent to bind the ships for supplies. But the trouble with this contention is that the cited provision in the standard form of purchase agreement never became operative because the Shipping Board and the Virginia Shipbuilding Corporation never executed agreements containing such provisions, that is, the Shipping Board has not sold the ships to the Shipbuilding Corporation, and, in consequence, has not given it bills of sale, and the Shipbuilding Corporation has not paid for or acquired the ships under this or any form of agreement of purchase. Therefore, if the libellants, in running down the history of the ships, had encountered this standard form of purchase agreement it would, unsigned, have told them nothing to defeat their remedy under the statute.

There remains another paper in the case, being the second re-financing contract, bearing date July 19, 1920, between the Virginia Shipbuilding Corporation of the one part and the United States Shipping Board Emergency Fleet Corporation and the United States Shipping Board, representing the United States of America, of the other part. Without repeating the matters which moved the parties, this agreement provides inter alia that the Shipbuilding Corporation shall reconvey unto the United States of America the steamships Vanada and H. F. Morse (the latter being one of the ships here in question) and that the title to hulls 1, 2, 5, 6, 7, 9 and 10 (in which are included four of the ships here in question) are thereby transferred and conveyed to the United States of America. Provision was made for the use of net

ship revenues in the completion of the remaining hulls pending their contemplated purchase.

If the libellants had examined the contract of July 19, 1920, they would have found that the title to the H. F. Morse was to be conveyed to the United States of America (which was done on September. 22, 1920), and that by the agreement itself the title of each of the four remaining ships was conveyed to the United States of America, and that, so far as is shown, there the title remained at the time the libellants brought these actions and still remains. In other words, these transactions, disentangled from details, would have disclosed to the libellants several things: First, title of the ships in the United States of America at the time it turned them over to the Transport Company for operation under the agency agreement MO3, at the time the supplies were furnished, and at the time these actions were brought; second, an outstanding executory contract to sell the ships to the Virginia Shipbuilding Corporation, clearly distinguished from a contract of sale, White v. Treat (C. C.) 100 Fed. 290; Hammer v. United States, 249 Fed. 336, 161 C. C. A. 344; third, that the Virginia Shipbuilding Corporation had not purchased the ships under the contract, and, for that matter, may never purchase them; and, fourth, that there is no provision in any of the completed transactions withholding from the Transport Company authority to purchase supplies upon the credit of the ships. Hence there was nothing open to discovery by the libellants on inquiry which showed that the Transport Company, "the person ordering the * * * supplies * * * was without authority to bind the [vessels] therefor." It follows that the libellants can maintain their libels in personam.

The decrees below are affirmed.