THE VIGILANCIA.

THE ALLIANCA.

THE ADVANCE.

AMMON et al. v. THE VIGILANCIA. SAME v. THE ALLIANCA. SAME v. THE ADVANCE.[1]

(District Court, S. D. New York. November 2, 1893.)

1. MARITIME LIEN—SUPPLIES—WHAT DELIVERY CREATES LIEN.

There can be no delivery to the ship, in the maritime sense, either of supplies or cargo, so as to bind her in rem, until the goods are either actually put on board the ship, or else brought within the immediate presence or control of her officers.

2. SAME—HOME PORT — GOODS DELIVERED TO TRUCKMAN IN FOREIGN PORT— PLACE OF SUPPLY.

A steamship company was organized under the laws of New York, and its ships were docked in Brooklyn, the home port. Libelants, at Jersey City, delivered such supplies of oleomargarine as were ordered from time to time by the steamship company to trucks employed by libelants, which transported the supplies to the ships. The sale of oleomargarine is prohibited by the laws of New York. On the failure of the steamship company, libelants claimed that as the supplies had been delivered at Jersey City, to which port the ships were foreign, the title to the supplies passed there, and that a maritime lien was thereby created on the vessels. Held, that the place where the ships lay was the test of the place of supply, and that the supply was not complete until the delivery to the ships where they lay, and, as this was in their home port, no maritime lien was created thereby.

In Admiralty. Libels in rem for the value of supplies furnished. Dismissed.

Hyland & Zabriskie, for libelants.

Carter & Ledyard, for claimant.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

BROWN, District Judge. By the libels in the above cases a lien is claimed on the steamships above named for oleomargarine, or butterine, supplied for those steamers in 1892. The facts as to the supplies, and their amounts, are admitted. The conditions required for obtaining a statutory lien not having been complied with, the only question is, whether a maritime lien was acquired under the circumstances of an alleged sale and delivery of the goods in New Jersey.

The libelants are copartners, doing business at Jersey City, N. J. The steamers, at the time the supplies were furnished, were the property of the United States & Brazil Mail Steamship Company, a New York corporation, and lay at Roberts' Stores, Brooklyn, within the port of New York, their home port, where the goods were delivered on board. They were forwarded to the steamers from Jersey City, upon a written request, or message by telephone, sent in each instance from the general office of the steamship company in this city, by one of its office employes, known as the "port steward," calling for the supply of a certain amount of butter to the steamer named. Upon such orders, the libelants delivered the goods specified to truckmen employed by them in Jersey City, who took them over to the steamers at Roberts' Stores, Brooklyn, and there delivered them on board, and at the time of such delivery obtained an acknowledgment on behalf of the company of the receipt of the goods named, properly signed by one of the officers, or persons, on board the ship. The libelants had been accustomed to deal in this manner with the steamship company, and their vessels, for several years previous.

The sale of oleomargarine being prohibited by the laws of the state of New York within the limits of the state, it was contended for the libelants that by an arrangement between the libelants and the steamship company, the sale and delivery of the goods were intended to be complete, and were complete, in Jersey City, upon the delivery of the goods ordered to the truckmen there, so that the title to the goods passed in the state of New Jersey; and that the furnishing of the goods having been complete within the state of New Jersey, a maritime lien was acquired therefor. The truckmen, as I understand the evidence, were not in the general employment of the libelants, but were engaged by them to carry the goods to the steamers; they were paid, however, for the cartage, by the libelants. In the bills rendered to the company for the goods, there was no separate charge for cartage, because, as was testified, there had long been an understanding with the company that the prices at which the butterine was billed should include the cartage from Jersey City to the steamers. A maritime lien is claimed upon the contention that the delivery to and for the vessel was completed in Jersey City upon the delivery of the goods to the truckmen for the benefit of the ship.

I am unable to sustain the lien in these cases upon either theory that can be presented on behalf of the libelants. If the sale and delivery of the supplies to the steamship company were not complete

until the delivery of the goods to the ship at Roberts' Stores, clearly no maritime lien arises; since, in that view, the supplies were wholly furnished in the vessel's home port.

If, on the other hand, the libelants' evidence be deemed sufficient to prove that the title to the property passed in Jersey City to the steamship company, and that the delivery to the truckmen there was, in law, a delivery to that company; still, that would not amount to a delivery, or to a furnishing of supplies, to the ship in Jersey City; but only to a common-law delivery to the company, sufficient to bind the company in personam; which is a very different thing from a delivery to the ship, or binding the ship in rem. The ship was not in Jersey City; but within a different jurisdiction, a mile or two away. There can be no delivery to the ship, in the maritime sense, whether of supplies or of cargo, so as to bind the ship in rem, until the goods are either actually put on board the ship, or else are brought within the immediate presence or control of the officers of the ship. The Cabarga, 3 Blatchf. 75; Pollard v. Vinton, 105 U. S. 7, 9-11; The Caroline Miller, 53 Fed. 136; The Guiding Star, Id. 936, 943, and cases there cited.

Had the goods in question been lost while in transit from Jersey City to Roberts' Stores, where the ship lay, the steamship company might possibly have been personally liable for the goods; but plainly no lien for them could have arisen against the ship, because they would never "have come to the benefit of the ship." Per Nelson, J., (The Cabarga, supra.) No lien, therefore, arose when the goods were delivered to the truckmen in Jersey City, since the ship had not yet received the goods, and might never receive them. Something more had to be done, viz., to deliver them to the ship. As that delivery was an act necessary to the creation of a maritime lien, it follows that the "furnishing to the ship," so as to acquire a lien, was only completed at the place where the ship herself actually was. As this was in the home port, no maritime lien could arise. The place where the ship is at the time the supplies reach her, is the test in all such cases. Accordingly, where the supplies have been ordered and sent from the home port, but are delivered to the ship while she is in a foreign port, a maritime lien arises. The Sarah J. Weed, 2 Low. 555; The Agnes Barton, 26 Fed. 542; The Huron, 29 Fed. 183; The Chelmsford, 34 Fed. 399. The cases of The Patapsco, 13 Wall. 334; The Comfort, 25 Fed. 159; The Havana, 54 Fed. 203, cited for the libelants, are all cases in which the supplies were delivered on board the ship, while the ship was in a foreign port.

Holding, therefore, that the furnishing of supplies, for the purpose of obtaining a lien on the ship, is not performed until a delivery to the ship, or within the immediate control of her master, and that being done in these cases within the home port, it follows that the libels must be dismissed, with costs.