THE YANKEE.

(Circuit Court of Appeals, Third Circuit. May 18, 1916.)

No. 2083.

1. MARITIME LIENS ☞24—SUPPLIES—"FURNISHED SUPPLIES TO A VESSEL."

The dredge Yankee chartered to a dredging company was being used by it in dredging in the Delaware river below Philadelphia. Libelants furnished supplies on orders of the dredging company, which specified that they were for the Yankee and contained shipping directions pursuant to which the supplies were forwarded by rail and other carriers to a designated wharf in Philadelphia, from which they were taken by the dredging company to the dredge where it was at work. *Held*, that such supplies were "furnished * * * to a vessel," within the meaning of Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (Comp. St. 1913, § 7783), relating to maritime liens.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 30; Dec. Dig. ☞24.

For other definitions, see Words and Phrases, First and Second Series, Furnish.]

2. MARITIME LIENS ☞21—SUPPLIES—FEDERAL STATUTE.

Under such act one furnishing supplies for a vessel on proof of an order therefor from the owner or from a person to whom the management of the vessel has been lawfully intrusted at the port of supply, and of delivery to the vessel, has a prima facie right to a maritime lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 26; Dec. Dig. ☞21.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. MARITIME LIENS ⚖═65—SUPPLIES—FEDERAL STATUTE.

The provision of section 3 (Comp. St. 1913, § 7785) that the act shall not be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that the person ordering the supplies was without authority to bind the vessel therefor, contemplates the removal of the presumption of authority only when there are circumstances which require the exercise of reasonable diligence to ascertain the authority and places upon one attacking the presumption the burden of removing it by establishing such circumstances by affirmative evidence.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 103; Dec. Dig. ⚖═65.]

4. MARITIME LIENS ⚖═21—SUPPLIES—PRESUMPTION OF AUTHORITY TO BIND VESSEL.

That one furnishing supplies for a vessel had knowledge that the company ordering the same, which was in possession of the vessel, was in financial difficulty, does not put him on inquiry as to its ownership or authority to bind the vessel, so as to defeat the presumption of authority arising under the statute.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 26; Dec. Dig. ⚖═21.]

5. MARITIME LIENS ⚖═65—SUPPLIES—PROOF OF DELIVERY.

One furnishing supplies for a vessel *held* not entitled to a maritime lien therefor, where the evidence did not show that the supplies were actually delivered to or used by the vessel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 103; Dec. Dig. ⚖═65.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Suit in admiralty by John S. Latta, trading as John S. Latta & Co., Charles H. Whitney and S. Wheaton Smith, copartners as Charles H. Whitney & Co., the Benjamin F. Shaw Company, the Glen Brook Coal Company, and Paul J. Devitt against the dredge Yankee, the Rivers & Harbors Improvement Company, claimant. Decree for claimant, and libellants appeal. Modified.

Howard M. Long, George W. Harkins, and Howard H. Yocum, all of Philadelphia, Pa., for appellants.

Russell T. Mount, of New York City, and Bruce A. Metzger, of Philadelphia, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. This is an appeal from a decree of the District Court, affirming the report of a Commissioner and dismissing five libels filed against a vessel for supplies. As the report was affirmed and the decree entered without an opinion, we must assume that the Commissioner's findings were accepted by the court as an expression of its views.

It is not necessary to recite or even summarize the testimony of each case. It will be sufficient to state only so much thereof as will present to the best advantage the theory of the law upon which the claimant made its defense and the Commissioner based his findings.

⚖═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The dredge Yankee was a centrifugal blower dredge, owned by the Rivers and Harbors Improvement Company and leased to the Breakwater Construction Company under covenants which prohibited the lessee "to suffer or permit any lien or liens, maritime or other, to attach" to the vessel. The Yankee was then chartered or "rented" by the Breakwater Company to the Atlantic Dredging Company, for use in its dredging operation on the River Delaware. A written charter was prepared but not executed. There was an exchange of letters between the officers of the two companies stating the terms upon which the Yankee was to be used. These letters were lost, but their contents were proven. For the purpose of this discussion we will assume, without deciding, that this correspondence constitutes a charter party, that thereby the Dredging Company derived from the Breakwater Company no greater power than the latter company acquired under the lease, and that therefore the Dredging Company was without authority to bind the vessel for supplies and necessaries.

It is conceded that the possession of the dredge by the Dredging Company was not tortious or unlawful, and it is not denied that the Dredging Company, in its relation to the dredge, was in the position described by the statute, of a "person to whom the management of a vessel at the port of supply is entrusted."

[1] The Dredging Company was engaged in dredging the channel of the Delaware river south of Philadelphia under contract with the United States. The Yankee was procured to enlarge the fleet already assembled and to promote the operation then under way. In preparing the Yankee for work, and during its progress, certain repairs, supplies and necessaries were required. These were ordered from the libellants on one occasion by the captain and on all others by the Dredging Company. Each order specified the supplies to be for the Yankee, and in each instance the supplies were forwarded to her pursuant to shipping instructions accompanying the order. These instructions varied according to the source of the supplies and to the railroad over which they were to be shipped, but in each instance the instructions designated a wharf or pier in Philadelphia to which the supplies were to be delivered, whence they were carried either by tugs or barges of the Dredging Company or by other river craft to the Yankee in her position on the lower river.

The transaction of delivery which best presents the position of the claimant, is that of Charles H. Whitney and Company. The Dredging Company inquired of that company its price for dredge pipe. Whitney and Company replied, quoting price "f. o. b. works" at an interior point in Pennsylvania, "freight allowed to Philadelphia." The Dredging Company gave the order as follows:

"Ship to Atlantic Dredging Company at Christian Street Wharf, % Armstrong and Latta Company, via P. R. R., marked 'For Dredge Yankee,' immediately, 1000 feet I. D. pipe."

Pursuant to these instructions, the pipe was marked and billed "For Dredge Yankee," and shipped over the Pennsylvania Railroad to Christian Street wharf in Philadelphia, at which place it was unloaded by

the Dredging Company and then loaded on one of its barges and towed to the Yankee, and by her received and used as a part of her tackle and equipment. The claimant maintained, and the Commissioner found, that as these supplies were not delivered by the libellant directly to the vessel, but were delivered to her by means of transportation instrumentalities which were not the agents of the libellant, the transaction, therefore, did not constitute "furnishing * * * supplies * * * to a vessel" within the meaning of the act conferring a maritime lien, but constituted a delivery to the Dredging Company at the interior point of consignment in completion of a common law sale to that company.

The act of June 23, 1910 (36 Stat. 604, c. 373 [Comp. St. 1913, §§ 7783-7787]), which is recited in full in the margin,[1] affords a maritime lien, under certain circumstances, to any person "furnishing repairs, supplies or other necessaries * * * to a vessel." It is maintained by the claimant, that this expression had received judicial interpretation prior to its use in the act, that the expression, as employed by the act, conveys the meaning judicially given it, and that that meaning supports the contention of the claimant and the finding of the Commissioner. Of the cases on which the claimant relies for authority, several have been decided since the enactment of the statute and two before. The later cases are Ely v. Murray, 200 Fed. 368, 118 C. C. A. 520; The Geisha (D. C.) 200 Fed 865; The Bethulia (D. C.) 200 Fed. 879. These do not require discussion, for they do not bear upon

[1] "Section 1. Any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

"Section 2. The following persons shall be presumed to have authority from the owner or owners to procure repairs, supplies, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

"Section 3. The officers and agents of a vessel specified in section two shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel, but nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.

"Section 4. Nothing in this act shall be construed to prevent a furnisher of repairs, supplies, or other necessaries from waiving his right to a lien at any time, by agreement or otherwise, and this act shall not be construed to affect the rules of law now existing, either in regard to the right to proceed against a vessel for advances, or in regard to laches in the enforcement of liens on vessels, or in regard to the priority or rank of liens, or in regard to the right to proceed in personam.

"Section 5. This act shall supersede the provisions of all state statutes conferring liens on vessels in so far as the same purport to create rights of action to be enforced by proceedings in rem against vessels for repairs, supplies, and other necessaries."

the matter before us except as they cite with approval a certain expression found in the two earlier cases. The earlier cases are the Vigilancia (D. C.) 58 Fed. 698, decided by the District Court of the United States for the Southern District of New York in 1893, and the Cimbria (D. C.) 156 Fed. 378, decided by the District Court of the United States for the District of Massachusetts in 1907.

The Vigilancia was libeled for supplies. The circumstances were unique. The vessel was lying in her home port of New York, and the supplies ordered by her owner were furnished by the libellants from the State of New Jersey. They consisted of oleomargarine, the sale and delivery of which within the State of New York were prohibited by the laws of that state. As delivery of supplies of this kind to the vessel lying in New York would be an infraction of the law, and as delivery of supplies of any kind to the vessel at her home port would not at that date raise a maritime lien, the libellants disclaimed delivery in New York and maintained that the supplies had been furnished to the vessel in the State of New Jersey and a maritime lien had there been acquired under an arrangement with the owner that the sale and delivery were intended to be completed in Jersey City upon their delivery to truck-men for transfer to the ship in New York.

In The Cimbria, supra, the facts were strikingly similar to those of The Vigilancia. Equipment for that vessel had been shipped f. o. b. New York on the owner's order. The vessel was lying in Bangor, Maine, her home port. Because of this impediment to a maritime lien, the libellant disclaimed delivery to the ship at her home port, and maintained that delivery had been made to the ship in New York at the time of consignment.

In each of these cases the court was called upon to determine a question then always present in cases of maritime liens, namely, whether the supplies were furnished the owner upon his credit or the ship upon her credit. The courts in the two cases decided, that to hold a vessel in rem for supplies or cargo, actual delivery thereof must be made *to the vessel.* Pollard v. Vinton, 105 U. S. 7, 9–11, 26 L. Ed. 998; and that when supplies are concededly delivered at a port distant from the port in which the vessel lay, there can be no constructive delivery to the absent vessel, and the delivery must therefore be to her owner. In neither case did the court decide, that a materialman at an interior point could not ship and actually deliver supplies to a vessel lying in a distant port. In announcing its decision with reference to facts which precluded actual delivery to the vessel, the court in The Vigilancia repeated a well recognized principle of maritime law, that:

"There can be no delivery to a ship, in the maritime sense, whether of supplies or of cargo, so as to bind the ship in rem, until the goods are either actually put on board the ship, or else are brought within the immediate presence or control of the officers of the ship."

The claimant has grasped this expression and clings to it as authority for its contention that when a materialman does not himself deliver supplies directly to the ship, but delivers them by the indirect means of rail and water carriers, the delivery is made at the point of consignment. The difference in fact between The Vigilancia and The Cim-

bria and the cases under consideration, as well as the difference in the law effected by the act of Congress of 1910, deprives those cases of a bearing upon the question under consideration. In The Vigilancia and The Cimbria, actual delivery to the vessels, either by direct or indirect means, was impossible and was specially disclaimed because of the necessities of the situation. In the cases before us, supplies could actually be delivered and in fact were actually delivered to the vessel at her port of supply. The question in these cases is not whether there was a constructive delivery to the vessel, but whether the delivery made was to the charterer at the source of the supplies or to the vessel at their destination. What proof does the law require to determine this question?

The liability of a ship for materials and services has been the subject of controversy in maritime jurisprudence, running through the centuries. Its origin is obscured by antiquity and its continuance has been characterized by confusion and perplexity, an appreciation of which may be obtained from the exhaustive opinion of Judge Lowell in The Underwriter (D. C.) 119 Fed. 713. Until recently the right of a materialman to a maritime lien rested upon a variety of considerations. Stated very briefly, it depended upon whether the supplies had been furnished in a foreign or domestic port, whether they had been furnished upon the credit of the ship's representative or upon the credit of the ship, and then whether upon the order of the owner or the master. The enforcement of these rights was made difficult by reason of rules of evidence respecting the burden of proof and because of conflict of jurisdiction claimed and asserted by different courts. The City of Milford (D. C.) 199 Fed. 956; Ely v. Murray, 200 Fed. 368, 118 C. C. A. 520; Trust Co. v. Bermuda A. S. Co. (D. C.) 211 Fed. 989, 996; The Underwriter, supra. By the Act of June 23, 1910, 36 Stat. 604, Congress attempted to simplify the law and to quiet its controversies by defining when and under what circumstances a maritime lien may be acquired. Compliance with requirements of a state statute as a condition precedent to the assertion of a lien, as held by some cases, is disposed of by making the federal act supersede the provisions of all state statutes. The distinction between foreign and domestic ports is abolished. The allegation and proof that credit was given to the vessel is no longer required, and a maritime lien, enforceable by a proceeding in rem, is afforded "any person furnishing repairs, supplies or other necessaries * * * to a vessel * * * upon the order of the owner or owners of such vessel, *or of a person by him or them authorized.*" To stay controversy as to whether another person has been authorized by the owner to procure supplies and bind the vessel, the statute affords a presumption of such authority in certain designated persons or officers, thereby relieving the libellant of the difficulty and sometimes the impossibility of presenting proof of that authority. They are "the managing owner, ship's husband, master, or *any person to whom the management of the vessel at the port of supply is entrusted.*" Those so entrusted include "officers and agents of a vessel * * * appointed by a charterer or by an owner pro hac vice, or by an agreed purchaser in possession of the vessel."

[2] The effective provisions of this act, by which Congress disposed of the controversial features of the law of maritime liens, are those which dispense with proof that credit was given the vessel, and substitute a presumption in lieu of proof of the authority of the owner and of a person other than the owner to procure supplies and pledge the vessel. Being relieved of the necessity of proving credit to the vessel and being clothed with the presumption of the validity of the order, the libellant, upon proving delivery to the vessel, enters court with a prima facie right to a maritime lien.

Thus came the libellants in the cases before us. What did these prima facie cases show? They disclosed, first, an order for supplies given by the Dredging Company, which was lawfully in possession of the vessel and was the "person to whom the management of the vessel at the port of supply [had been] entrusted"; second, the presumption, afforded by the act in lieu of proof, that the Dredging Company, as such person, had "authority from the owner" to give the order and "procure * * * supplies * * * for the vessel"; and third (excepting in one case), actual delivery of the supplies to the vessel. To these prima facie cases the claimant made a twofold defense; first, that delivery was not made to the vessel but was made to the charterer; and second, if made to the vessel, then the libellants are within an exception to the presumption afforded by the act, and are without right to maritime liens. With respect to the first ground of defense we may say, that we do not hold that a materialman may not waive the right to a maritime lien, for the act especially provides for such a waiver, or that he may not forfeit the right under circumstances showing delivery not to the ship but to the owner or charterer. Ely v. Murray, 200 Fed. 368, 371, 118 C. C. A. 520. But as against the contention of the claimant, we hold that a materialman may make actual delivery of supplies to a vessel in the maritime sense, by causing them to be transported by rail and water carriers by interrupted stages from their point of origin to the vessel side, when the transaction is begun by a valid order indicating that the supplies are for the vessel and are to be delivered to her, and is completed by an actual delivery to the vessel consistent with the instructions of the order and the intentions of the parties giving and accepting it. Without discussing the evidence, we are satisfied that in four cases supplies were furnished to the vessel in the maritime sense by deliveries actually though indirectly made by the libellants to the vessel at her port of supply.

But it is contended by the claimant, that even if it should be found that actual deliveries had been made to the vessel, they were made upon orders of the charterer under circumstances which destroyed the statutory presumption of its authority. Unquestionably the presumption of the statute may be removed and the right to a lien based upon it destroyed by affirmative proof which actually displaces it. The Patapsco, 80 U. S. (13 Wall.) 329, 20 L. Ed. 696. This the statute contemplates by prescribing that no lien is conferred "when the furnisher knew or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement

for sale of the vessel, or for any other reason, a person ordering repairs, supplies or other necessaries, was without authority to bind the vessel therefor." This proviso is nothing more than a statutory declaration of a principle long recognized in maritime jurisprudence and repeatedly announced by the Supreme Court of the United States. The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710. It is in effect that no lien shall be afforded and no presumption given in aid of a materialman who furnishes supplies under circumstances which put him on inquiry as to the authority of the one giving the order to bind the vessel. That is, no one with knowledge that supplies are ordered by one without authority to pledge the vessel, or no one awake to circumstances which suggest inquiry as to that authority, may shut his eyes to what he sees or to what he could see by looking, and avail himself of the remedies or the presumptions of the law.

[3, 4] What are the circumstances upon which the claimant relies to bring the libellants within the proviso of the act? They consist, first, of the libellants' knowledge of the financial difficulties of the Dredging Company, and second, of the failure of the libellants to inquire concerning the authority of the Dredging Company to bind the Yankee for supplies. The circumstance of financial difficulty of the Dredging Company would not have deprived a materialman of a right to a lien had the Dredging Company owned the Yankee. Therefore, knowledge of the Dredging Company's embarrassment suggested nothing concerning that company's ownership of the Yankee or its authority to pledge her for supplies. Nor did there devolve upon the materialman the duty to inquire concerning its ownership and the authority of the Dredging Company without attendant circumstances raising the question. Such circumstances must include something more than a mere order from a new customer, and without circumstances suggesting or compelling inquiry the statute does not require a supplyman to ascertain the authority of the one giving the order, if he be a person designated by the statute. If such a duty devolved upon a materialman to be performed at his peril in all instances and without regard to circumstances, then the act would impose upon the materialman the duty to ascertain with absolute certainty the validity of an order as a condition precedent to a maritime lien. If this were true, the presumption of authority afforded by the act would be without purpose and the very object of the act defeated.

But the law contemplates the removal of the presumption of authority to pledge the vessel only when there are circumstances which require the exercise of reasonable diligence to ascertain the authority, and places upon the one attacking the presumption the burden of removing it by establishing such circumstances by affirmative evidence. The Patapsco, 80 U. S. (13 Wall.) 329, 20 L. Ed. 696; The Iola (D. C.) 189 Fed. 972, 979; The Ha Ha (D. C.) 195 Fed. 1013; The Lucille (D. C.) 208 Fed. 424. Such evidence, in our opinion, was not produced by the claimant. In all the cases, excepting one presently to be mentioned, the testimony discloses that the libellants did not know that the Yankee was under charter to the Dredging Company, and

fails to disclose any circumstance which gave an inkling to the libellants that the Yankee was under charter to the Dredging Company. The course of dealing in every instance (save one) was an order from the Dredging Company to the materialman for supplies for the Yankee, accompanied by shipping instructions. The negotiations developed nothing as to the charter of the Yankee and suggested nothing otherwise than that the Yankee was owned by the Dredging Company. It is in just such a case as this, that the statute affords the presumption of authority of the person ordering supplies to bind the vessel therefor, and intends that the presumption shall remain and control until removed.

Hesitating, as we always do, to disturb facts found by a trial court in an equity case, we are constrained to hold that in four cases there is a clear mistake of fact as well as a misapplication of the law, and we therefore direct that the decree be reversed in so far as it relates to the libels of John S. Latta and Company, Charles H. Whitney and Company, Paul J. Devitt and Glen Brook Coal Company.

With respect to the claim of the last named libellant, which grew out of a contract to supply coal for the whole fleet, we are satisfied that in giving the order, the quantity to be supplied to and daily consumed by the Yankee, was mentioned and considered by the parties, and that of the total amount of coal supplied, a definite portion was appropriated for and furnished to the Yankee within the rule of law applicable in such cases. The Kiersage, Fed. Cas. No. 7762; The Murphy Tugs (D. C.) 28 Fed. 429; McRae v. Bowers Dredging Co. (C. C.) 86 Fed. 344.

[5] The decree is affirmed in so far as it relates to the libel of Benjamin F. Shaw Company. In that case the Commissioner found as a fact that the evidence does not disclose that the supplies were actually delivered to or received by the dredge or used in connection with her. In this we think he was correct. It follows, therefore, that the libel of the Benjamin F. Shaw Company is squarely within the law of The Vigilancia and The Cimbria, for the delivery here made, not having been made to the vessel, must have been made to the charterer, and even if made to the vessel, was made under circumstances with regard to knowledge of the charter, that precluded the right to a maritime lien. From these circumstances it appears that Townsend W. Miller was secretary and treasurer of the libellant and was also a member of a creditors' committee of the Dredging Company. The supplies were shipped by the libellant under his supervision, and the affairs of the Dredging Company were known to him, at least to the extent that the Yankee was not owned by the Dredging Company, but was in its possession under rental. These are circumstances such as are contemplated by the proviso of the act, which suggest a doubt and compel inquiry with reasonable diligence. In this instance, the knowledge of its secretary and treasurer was knowledge of the libellant, and as the libellant forwarded supplies without pursuing inquiry as to the doubtful authority of the one ordering them to pledge the vessel, it is without right to recover against the vessel. A modification of the decree in harmony with this opinion is directed.