## THE DEFIANCE.

(District Court, E. D. North Carolina. November 15, 1924.)

**1. Maritime liens ⬯24—Statute held not to bar proof that supplies or equipment were furnished on credit to owner alone.**

Merchant Marine Act 1920, § 30, subsec. P (Comp. St. Ann. Supp. 1923, § 8146¼ooo), giving maritime lien for supplies furnished vessel enforceable by suit in rem in which it shall not be necessary to allege or prove that credit was given to the vessel, does not bar proof, to defeat lien, that supplies or equipment were furnished on the credit of the owner alone.

**2. Maritime liens ⬯24—Sale of marine engine to owner of vessel on credit of owner alone held not to create lien.**

Written contract for purchase of marine engine by owner and master of vessel, not mentioned therein, in which seller reserves title and which excludes verbal understandings or agreements, *held* not to create maritime lien under Merchant Marine Act 1920, § 30, subsec. P (Comp. St. Ann. Supp. 1923, § 8146¼ooo), notwithstanding stipulation in notes that lien shall not be affected, since engine was furnished on the credit of the owner.

**3. Evidence ⬯442(6)—Seller's opinion that it had not waived lien not admissible where written contract excluded verbal understanding.**

Where contract for sale of marine engine was complete in itself, and provided that "no verbal understanding whatsoever" should affect the rights of either party, testimony that seller considered that it had not waived its maritime lien was not admissible.

**4. Maritime liens ⬯24—Seller's opinion that maritime lien existed held not to create lien.**

The mere fact that seller of marine engine, sold on credit of owner and not credit of vessel, considered that maritime lien existed, would not of itself create lien, under Merchant Marine Act 1920, § 30, subsec. P (Comp. St. Ann. Supp. 1923, § 8146¼ooo).

**5. Maritime liens ⬯24—Lien defeated by failure to make delivery of engine to vessel's side.**

A maritime lien under Merchant Marine Act 1920, § 30, subsec. P (Comp. St. Ann. Supp. 1923, § 8146¼ooo), for marine engine, if lien existed, was defeated by unconditional delivery of engine to owner at point distant from vessel, instead of to vessel's side.

**6. Maritime liens ⬯31—Transferee of note acquired no lien where seller itself had no lien.**

Where no maritime lien existed in favor of seller of marine engine, transferee of purchase-money note acquired no lien.

**7. Maritime liens ⬯24 — One who advanced money on personal credit of master for purchase of marine engine acquired no lien.**

One who, on master's credit, advanced money with which master of vessel purchased marine engine, acquired no maritime lien under Merchant Marine Act 1920, § 30, subsec. P (Comp. St. Ann. Supp. 1923, § 8146¼ooo).

**8. Admiralty ⬯16—Priority of mortgage could be determined in libel against vessel by lien claimant.**

In libel against vessel by lien claimant, priority of mortgage could be determined, though mortgage, being in its nature nonmaritime, could not have been made basis of a libel in rem.

In Admiralty. Libel by Fairbanks, Morse & Co., Incorporated, against the motor vessel Defiance, in which sundry intervening libels were filed. Decree for respondent.

Aydlett & Simpson, of Elizabeth City, N. C., for Fairbanks, Morse & Co., Inc.

Winfield A. Worth, of Elizabeth City, N. C., for People's Commercial & Savings Bank.

John Henry Skeen, of Baltimore, Md., for Walter C. Finch.

GRONER, District Judge (sitting for CONNOR, District Judge). On the 5th of April, 1923, libelant filed its libel against the motor vessel Defiance. Sundry intervening libels were thereafter filed, and on the 15th day of May, 1923, an order of sale was entered, the vessel sold, and the proceeds deposited in court to await the final determination of the cause. A reference was made to a special master, who reported the liens and the order of their priority, and a decree was entered, by agreement of parties, confirming the report as to sundry of the interveners, and payment of their claims has been heretofore made; leaving for determination only the claims of the libelant, Fairbanks, Morse & Co., Walter G. Finch, the People's Commercial & Savings Bank, and F. J. Carpenter, the fund remaining in the registry of the court being insufficient to pay all of these claims in full.

Mrs. Fannie P. Willis was the owner of the Defiance, an auxiliary sailing vessel of under 200 tons burden. Her husband, E. M. Willis, was the vessel's master. The People's Commercial & Savings Bank, hereinafter referred to as the "bank," is the holder of a mortgage on the vessel of date September 15, 1921. Fairbanks, Morse & Co., hereinafter referred to as "Fairbanks," claims a lien for a marine engine furnished to the vessel. Carpenter is the holder of one of the notes originally given on account of the deferred purchase price of the Fairbanks engine; and Finch is the holder of a note made by Capt. Willis and his wife, originally for the sum of $500, but reduced to $400. The main contest is between the bank and Fairbanks. If the latter is entitled to a maritime lien, it is conceded it will have priority over the bank's claim and will absorb the entire fund.

The bank insists that Fairbanks is not entitled to a lien, on the ground that the sale of the engine was upon the credit of the owner, exclusively, and not upon the credit of the boat.

The facts are these: In August, 1922, Willis, master of the Defiance, went to the office of Fairbanks, in Baltimore, for the purpose of purchasing a new engine to be installed in the Defiance; the one then in use having proved unsatisfactory. He was, apparently, without funds, and at his request the agent of Fairbanks joined him in a visit to Washington for a conference with the president of the bank in an effort to induce the latter to advance the necessary money to make the purchase, or to release the bank's then existing mortgage and create a new mortgage in which the bank's debt and the price of the engine would be combined, with a division of the notes. This effort resulted in failure, and subsequently and within a few days Capt. Willis, having raised the sum of $1,500, $500 of which was furnished by the intervener, Finch, arranged with Fairbanks for the purchase of the engine on a basis of $1,500 in cash and the balance in twelve notes, eleven of them for $429.16 each, payable monthly, and one for $500, payable in ninety days; and on August 24th, when the purchase and sale was consummated, a written contract was entered into between Capt. Willis and his wife on the one hand and Fairbanks on the other, which was as follows:

"Fairbanks, Morse & Co. (Incorporated)

"General Proposal.

"Place: Baltimore, Md.

"Date: August 24, 1922.

"To E. M. Willis and Fannie P. Willis, Beaufort, N. C.: We hereby propose to furnish and deliver f. o. b. cars at Baltimore, Md., the following as per specifications below."

Then followed a description of the engine and parts, after which were lines to be filled in, in order to show the delivery point, which were left blank, and a guaranty of the workmanship; after which the contract provided as follows:

"We propose to furnish the property as specified herein for the sum of seven thousand, one hundred, fifty dollars ($7,150.00), to be paid at the company's office shown herein as follows:

$1,500.00 cash with order.

"Balance in 12 monthly notes, first one due October 15, 1922, after shipment.

"All deferred payments are to be evidenced by negotiable notes payable to the order of this company, dated and delivered as of date of shipment and to bear interest from said date at the rate of ———— per cent. per annum. The above payments represented by notes are to be secured by————.

"This proposal is made upon the following conditions."

The conditions were that the title and ownership of the machinery should remain

3 F.(2d)—4

in the company until final payment. The company retained the right to discount or transfer the notes; the title or right of possession in or to the machinery to pass thereby to the holder of the notes. In the event of default in the payment of any of the notes when due, the whole amount should immediately become due, as a result of which the company should have a right to take possession of the machinery and sell the same and after satisfying its debt to pay over any balance remaining to the purchaser. There were also provisions providing that the machinery should retain its character of personal property, however affixed or attached to any building or structure, and a provision requiring the purchaser to indemnify against fire, etc. In conclusion, the contract provides in express terms as follows:

"It is expressly understood this proposal made in duplicate contains all agreements pertaining to property herein specified, there being no verbal understanding whatsoever, and when signed by purchaser and approved by an executive officer or local manager of Fairbanks, Morse & Co. becomes a contract binding parties hereto."

The contract was approved by an executive officer of Fairbanks, and accepted by Fannie P. Willis and E. M. Willis.

It will be observed from the above that the contract was one of that character generally known as a conditional sale contract or reserved title contract, and that it nowhere contained any suggestion or mention of the use to which the engine was to be put. Read by itself, the contract was a sale to the Willises without reference to the vessel. Delivery, actual as well as that agreed in the contract, was to be f. o. b. cars, Baltimore, although the vessel was at that time in the waters of Elizabeth City, N. C.; and if that were all there would, of course, be nothing on which a lien against the vessel could reasonably be asserted. The notes, however, which were given at the time the contract was executed, were on a printed form, and just above the signatures of the makers contained the following provision:

"It is expressly understood and agreed that the acceptance of this note by the payees shall not and does not in any manner or form waive or affect the maritime lien which the payees now have or may hereafter have against any boat or any other water craft of the makers within the admiralty jurisdiction of the federal courts."

And, in further support of its claim for a lien, Fairbanks introduced, over the objection of counsel for the bank, the testimony of its sales agents and of Capt. Willis, to show that it was understood between the parties at the time the contract was made that the engine was intended to be installed in the Defiance and was necessary in her operation. A witness, James P. Hill, who was the salesman for Fairbanks, testified that "Capt. Willis came into the office. He said his present engine, the engine that was in the boat, he could not operate, and he said he wanted to get a Fairbanks Morse 100 horse power engine. We had one right in stock and that is the engine he wanted." Carpenter, another witness for Fairbanks, who was present when the transaction was consummated, testified that he knew of his own knowledge that the engine was installed in the Defiance, because he had seen it there some two or three months after delivery. And he also testified that at the time the contract was executed he mentioned to Capt. Willis that, as there was a mortgage on the boat, "we would naturally figure on our maritime lien for our protection." Capt. Willis testified that the installation of the engine purchased from Fairbanks was completed September 25th at Elizabeth City, having been brought from Baltimore to Elizabeth City by his order and at his expense.

Subsection P of section 30 of the Merchant Marine Act of 1920 (41 Stat. L. 1005 [Comp. St. Ann. Supp. 1923, § 8146¼ooo]) provides that:

"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

The act, so far as it affects the matter under consideration, is in all respects similar to the Act of June 23, 1910 (Comp. St. §§ 7783–7787). The purpose of Congress in the enactment of these statutes was to simplify the law and definitely to define when and under what circumstances a maritime lien may be acquired. As was said by Judge Woolley, in The Yankee, 233 F. 919, 147 C. C. A. 593:

"The distinction between foreign and domestic ports is abolished. The allegation and proof that credit was given to the vessel is no longer required, and a maritime lien, enforceable by a proceeding in rem, is

afforded 'any person furnishing repairs, supplies or other necessaries * * * to a vessel * * * upon the order of the owner or owners of such vessel, or of a person by him or them authorized.' To stay controversy as to whether another person has been authorized by the owner to procure supplies and bind the vessel, the statute affords a presumption of such authority in certain designated persons or officers, thereby relieving the libelant of the difficulty and sometimes the impossibility of presenting proof of that authority."

The facts in the case at bar show that the equipment purchased of Fairbanks was necessary in the operation of the vessel; that it was purchased upon the order of the owner's representative, and, though delivered in a distant port to the owner's agent, it eventually found its way to the vessel, as it was mutually intended it should. The question for determination, therefore, is twofold: First, does a lien exist in the case of a sale direct to the owner, evidenced by a written contract, entire in itself, in which the vessel is unnamed and in which the seller reserves the title until payment of the balance of the purchase price; and, secondly, if under such circumstances a lien arises because of the mutual intention of the parties, is it defeated by the failure to make delivery to the vessel's side?

In passing, it may be observed that the answer to neither of these questions is wholly without doubt; but after careful consideration the conclusion I have arrived at is that the first question should be answered in the negative and the second in the affirmative.

[1-4] The effect of the statute avoids the necessity of proof that credit was given to the vessel. It does not, however, bar proof that the supplies or equipment were furnished on the credit of the owner alone, and it cannot be doubted that in the latter case no lien exists. If this be correct, it would follow, necessarily, that a decision of the question depends upon the facts. The evidence here shows that prior to the purchase of the engine the master of the vessel and Fairbanks, the seller, were in communication; that the latter, in an effort to obtain security, had endeavored to have a prior mortgagee release his mortgage (not preferred) and, failing in this, or in the procurement of the entire amount in cash or in securing a solvent indorser on the notes representing the deferred purchase price, had chosen a medium of sale which, in his opinion, provided the necessary security for the payment of the purchase price of the engine. To this end it entered into a written contract with E. M. Willis and Fannie P. Willis, not in their capacities as master and owner of the vessel, but wholly in their individual capacities, and in this contract set out in the utmost detail the conditions which should govern and control the sale and delivery of the property, and in distinct terms provided that the agreement thus entered into contained the entire contract, and that "no verbal understanding whatsoever" should affect the rights of either party. Under these circumstances, the objection that was made to the evidence offered by Fairbanks that it considered that it had not waived its maritime lien, was properly taken, for by its very terms the contract contained the whole agreement and neither party could add to or diminish its provisions. But even if this were otherwise and the evidence admissible, the mere opinion of one or the other of the parties that a maritime lien existed would not of itself create one, for as was said by the Supreme Court in Piedmont, etc., Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, 41 S. Ct. 1, 65 L. Ed. 97:

"The fact found by the lower courts that the parties understood the law would afford a lien on the vessels for the coal is, in this controversy, without legal significance."

Since, therefore, the parties, by their own solemn contract in writing, have declared the whole agreement to be a sale on the part of the one to the other with a reservation of title, and an agreement on the part of the other to pay the balance of the purchase price in monthly installments, and have likewise declared that no verbal understanding or agreement should modify these terms, it seems to me it would be a far stretch of a law to hold that this was a sale on the credit of the vessel; nor in my opinion is this conclusion shaken by the printed stipulation contained on the face of the notes evidencing the deferred payments, for in itself it is no more than a claim of reservation of a lien on an unnamed vessel if the law should give it.

[5] The second question, as has been stated above, must likewise be found against the claimant; for notwithstanding the fact that the engine appears to have been actually installed on the vessel, it is uncontradicted that unconditional delivery (except as to the reservation of title) was made to the individual purchasers in Baltimore, when the vessel was in another state some 250 miles or more away. As was said by Mr. Justice Brandeis in the Piedmont Coal Company Case, supra:

"The difficulty here * * * is not in

failure to show that the coal was furnished to the vessels but in failure to prove that it was furnished by the libelant."

In The Yankee, supra, the supplies for which a lien was claimed were ordered for a dredge then operating in the Delaware river. In each instance the supplies ordered were specifically designated as supplies for the Yankee, to be shipped to the dredging company at Christian Street wharf, Philadelphia, marked, "For Dredge Yankee." When received at the wharf they were unloaded and loaded on a barge and towed to the Yankee and by her received and used. The Circuit Court of Appeals (Third Circuit) held that this was a sufficient delivery to comply with the statute and to create the lien; but the facts there and, here are by no means analogous. There, as here, it is true, the delivery was made some distance from the vessel's side; but there, unlike here, the delivery was specifically for the dredge, at the nearest point at which delivery could be made in the ordinary course of transportation. In the case at bar the delivery was in Baltimore. There was nothing in the contract which, as has been already stated several times, embraced the entire agreement, which imposed an obligation on the purchaser to use the engine on the Defiance. Without breaching in any way its terms, the engine could have been lawfully used on any other vessel or for any other purpose. So far as the agreement bound the purchaser, he might never have installed it on the Defiance; and absolutely nothing was done by the seller to see that he did, and apparently it never knew whether it was so installed, or not until some months later when its salesman happened to be aboard the vessel and observed a Fairbanks engine in use which he took to be the one his company had sold. If it had been lost in transitu from Baltimore to Elizabeth City, a maritime lien could not by any possibility have arisen. It seems to me equally true that if the purchaser had, as he might lawfully have done, converted it to some other use, the same result would have ensued.

The rule applicable under such circumstances is that announced by Judge Brown in The Vigilancia (D. C.) 58 F. 698. In that case the delivery of the supplies was to a truckman in Jersey City for transportation to the vessel in New York. Such a delivery Judge Brown held merely to be a common-law delivery to the company, sufficient to bind the company in personam, but

entirely different from a delivery to the ship's side so as to bind the ship in rem.

"The ship was not in Jersey City; but within a different jurisdiction, a mile or two away. There can be no delivery to the ship, in the maritime sense, whether of supplies or of cargo, so as to bind the ship in rem, until the goods are either actually put on board the ship, or else are brought within the immediate presence or control of the officers of the ship."

[6] The claim of Carpenter to a lien must, likewise, be denied, for in no case could he stand in any better plight than Fairbanks, from whom he acquired the note.

[7] The claim of Finch is, if anything, less meritorious than the two above. In his case he advanced his money, clearly, on the personal credit of the master of the vessel.

[8] While the mortgage of the bank, being in its nature nonmaritime, could not have been made the basis of a libel in rem, it may, nevertheless, as declared in The J. E. Rumbell, 148 U. S. 1–15, 13 S. Ct. 498, 37 L. Ed. 345, have its priority determined in this suit. The other claims superior to it having been paid, and the claims disallowed herein removed, it is entitled to the balance of the fund on hand.